**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Paul EWBANK, aka "Pablo", Defendant-Appellant.**

**No. 73–1331.**

United States Court of Appeals, Ninth Circuit.

Aug. 16, 1973.

Rehearing Denied Oct. 3, 1973.

John A. Hoskins (argued), Honolulu, Hawaii, for defendant-appellant.

Thomas P. Young, Asst. U. S. Atty. (argued), Robert K. Kukuda, U. S. Atty., Honolulu, Hawaii, for the plaintiff-appellee.

Before KOELSCH, WRIGHT and TRASK, Circuit Judges.

TRASK, Circuit Judge:

Paul Ewbank, also known as "Pablo", appeals from his conviction by the court, sitting without a jury, of the charge of distributing hashish oil, a controlled substance, in violation of 21 U.S.C. § 841(a)(1). Appellant admitted that he sold two vials of hashish oil on Feburary 16, 1972, to Special Agent Robert Aiu in the presence of an informer, Kerry R. Lee, for $400. He relied upon the defense of entrapment.

In support of his theory, appellant testified concerning his association with Kerry Lee, the informer. This testimony was not disputed. Appellant met the informer in June 1971, when the informer rented a room for a short time in appellant's house. Then, as appellant testified, Lee attempted through a series of acts to involve appellant, an admitted user, in a sale. Beginning in August 1971 Lee made efforts to purchase marijuana and hashish from appellant. He was unsuccessful. On several occasions Lee took appellant and his wife to dinner and gave marijuana and hashish to appellant. He made proposals to appellant to engage in business ventures involving the acquisition and sale of heroin, marijuana and hashish. Appellant refused. He offered appellant a chance to smuggle cocaine from South America which appellant declined. Lee then began to pressure the appellant to obtain drugs from appellant's sources for him, as a personal favor. Again, the appellant refused. The informer then asked appellant again as a personal favor, if he could obtain any kind of drug for informer's friend. Appellant stated that he could not. However, after about a week, appellant located a source and told him about Lee's efforts to obtain drugs. The source was a person named Ray Clark who had two vials of hashish oil for sale. Clark was a friend of appellant and needed some money in order to return to the mainland. Appellant testified that Clark left the hashish with him to complete the sale. This was done.

After hearing all of the testimony, the court in announcing its decision said:

"Ewbank, from his testimony, indicated that he wasn't going to be taken in by this Kerry Lee, the informant. I think it is clear from his testimony that the only reason he made this sale to Kerry Lee was because he was trying to do a turn to Clark, who had come to him to get rid of this oil. Of course, that wouldn't bring him within the protection of the doctrine of entrapment, giving him all the benefit of the doubt that this was the reason he sold. He was selling it to help Clark out. This was not a case where Kerry Lee was on his knees saying, 'I need this stuff. You want to get it for me.' Here was a case in which Clark said, 'I need money. I have got this oil. I want to see if you can get rid of it for me.'"

The law of entrapment in the Ninth Circuit has most recently been discussed by Judge Hamley in United States v. Granger, 475 F.2d 1022 (9th Cir. 1973). There he noted that with two exceptions this circuit has consistently applied the "Predisposition Theory" of entrapment as adopted in Sorrells v. United States, 287 U.S. 435, 453, 53 S.Ct. 210, 77 L.Ed. 413 (1932), and in Sherman v. United States, 356 U.S. 369, 378, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).[1] Of the exceptions commented upon,[2] United States v. Russell, 459 F.2d 671 (9th Cir. 1972), has been further limited by the discussion in its reversal by the Supreme Court, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (April 24, 1973).

We agree with appellant here that this is not a predisposition case in the sense of *Russell* where the evidence clearly

1. United States v. Tatar, 439 F.2d 1300, 1302–1303 (9th Cir. 1971) ; United States v. Walton, 411 F.2d 283, 288 (9th Cir. 1969).

2. United States v. Russell, 459 F.2d 671 (9th Cir. 1972), reversed, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (April 24, 1973) ; Greene v. United States, 454 F.2d 783 (9th Cir. 1971).

disclosed that appellant had actually been engaged in the criminal activity for which he was convicted prior to the time the government came upon the scene.

The fact that appellant here was involved in the drug culture, according to his own admission to being a user, does not establish that he was also a predisposed seller or distributor within the meaning of the crime of which he was convicted. But to establish that there was entrapment he must be able to convince the trier of fact that governmental activity in fact occurred which lured him as an otherwise innocent victim to the commission of crime by repeated and persistent solicitation. In *Sorrells, supra,* the trial court refused to submit this question to a trier of fact (a jury) in the face of evidence of such solicitation. This was error. In *Sherman, supra,* the Court found entrapment as a matter of law where the defendant, an addict, succumbed to entreaties of a fellow addict to sell drugs to him to relieve his craving.

The difficulty with the case of the appellant here is that he has not, by his own self-serving testimony, though it is undisputed, convinced the trier of fact that the requisite government intervention by persuasion, entreaty or blandishment was the reason for the sale which admittedly occurred.

The appellant related all of the occasions when the informer had importuned him and heaped favors upon him. Despite these numerous efforts by the informer, appellant had consistently refused to make or arrange sales to the informer or his friends. Appellant then went on to testify that it was only when appellant's own friend, Clark, who was not connected with the government, desired to make a sale that he loaned his services to the extent of making the sale himself.[3] Not surprisingly, Clark was never produced nor was any other corroboration for the story involving him. The trial court which heard this rather strange tale was convinced "that the only reason he made this sale to Kerry Lee was because he was trying to do a turn to Clark who had come to him to get rid of this oil."

The dissent characterizes the decision of this experienced district judge and the majority's affirmance as a "hairsplitting" rejection of that part of the testimony describing what had transpired over previous months. On the contrary, the court did consider it and pointed out that it proved that "Ewbank, from his testimony, indicated that he wasn't going to be taken in by this Kerry Lee, the informant." The inducing cause of the sale was the request that came from Clark, not from Lee. Clark needed money and it could as well have come from anyone else as from Lee. The trial court from Ewbank's own testimony could have found that Clark, or Ewbank on Clark's behalf, was just as willing to sell to anyone. Lee furnished the market but not the inducing cause of the sale. As an inducing or motivating cause of sale, Lee had consistently failed.

As the dissent points out, there is testimony from appellant (under some rather leading questioning) that he made the sale only to help the government informer by a sale to the informer's "friend." But what the dissent fails to consider in this case is that it is for the trial judge who has seen the witness and heard him testify, to assess his credibility and resolve questions of fact. United States v. Hodas, 467 F.2d 211 (9th Cir. 1972). Apparently the trial court did not believe this self-serving testimony. Although the burden is upon the government to prove absence of entrapment beyond a reasonable doubt, on a trial to the court we may presume that the court applied the proper standard in evaluating the rather bizarre tale of the appellant. *Hodas, supra.* As required by Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we

---

3. He testified that the price for the amount of hashish sold was $400. He passed on $400 to Clark. Clark gave him back $22 and a small portion of oil.

must support the court's judgment if the evidence justifiably leads to that conclusion. It is not our function to reverse because we might have decided differently had we been required to do the hairsplitting, or evidence evaluation or decision making. We must affirm unless the trial court's fact determination is "clearly erroneous." Fed.R.Civ.P. 52. We cannot say that it was.

Judgment affirmed.

KOELSCH, Circuit Judge (dissenting):

The court's decision is a sorry one. To set out the evidence verbatim would, I suppose, unduly lengthen this dissent. So I will content myself, for the most part, with a long résumé of the highlights, giving due regard to the teachings of *Glasser*. But if I understand correctly the teachings of *Sorrells, Sherman* and, most recently, *Russell*, this record affirmatively establishes a complete absence of criminal predisposition on the part of Ewbank—it fairly shrieks of entrapment.

Lee was not simply an "informer"; he was paid by the government to ferret out crime, but here by his unconscionable and unlawful methods he created one.

In this instance his efforts were not immediately capped with success. To the contrary, because Ewbank proved to be a most reluctant subject, they were pursued practically continuously over a period in excess of six months. Nor did they consist merely of repeated requests to sell Lee marihuana or drugs—but they included incidental behavior cleverly calculated to wear down Ewbank and hence "to trap the unwary innocent."

Lee first appeared on the scene in June, 1971, when he went to Ewbank's home and rented a room. He represented himself as a dealer in narcotics and shortly left for Honolulu ostensibly to transact some such business. Upon returning in August he approached Ewbank with the first of a series of requests to purchase marihuana or hashish.

During the ensuing weeks Lee was a frequent visitor at the Ewbank home and sometimes was an overnight guest. On several occasions he not only entertained Ewbank and his wife at dinner but also gave to them hashish and marihuana. However, Ewbank invariably rejected all Lee's requests to sell. But Lee persisted.

In November he again rented a room and himself offered to sell Ewbank hashish. Meeting with no success he resumed his practice of entertaining the Ewbanks and giving them marihuana. In addition he proposed to Ewbank that the two join forces and using his connections secure and smuggle illicit drugs into the United States from South America. Ewbank again stood firm. However, in February of 1972 Lee renewed his attempts. He called Ewbank nearly every day, the last several times giving a story about his need of any drug "for a friend." On February 16 Ewbank finally succumbed and made the sale for which he stands convicted.[1] It

---

1. This court accepts as correct the district judge's appraisal of Ewbank's testimony concerning Clark and apparently the conclusion that "I think it is clear from his [Ewbank's] testimony that the only reason he made this sale to Kerry Lee [Agent Aiu?] was because he was trying to do a turn to Clark who had come to him to get rid of this oil."

I must confess to a lack of the trial judge's ability—apparently shared by my brothers—to split hairs and reject as wholly immaterial all that had transpired over the months that had preceded this single sale. But more important, as I read the record it is completely barren of any proof to support the trial judge's factual determination that Ewbank's sole motivation was that "he was trying to do a turn to Clark. . . ." If it shows anything it shows that Ewbank was doing "a turn" for Lee. Here is the entire record on the subject:

"Q. Do you know someone named Ray Clark?

A. Ray Clark is a man I met at Baldwin Beach approximately February 13th. He was camping on the beach. He said he needed a place to stay for approximately a few days until he could

is little wonder that he eventually did so: "The ring on the finger becomes thin by wearing, the fall of dripping water hollows the stone."

We are told on the highest authority that "artifice and stratagem may be employed to catch those engaged in criminal enterprises" and that merely "to afford such persons opportunities or facilities for the commission of the offense does not defeat the prosecution," (Sorrells v. United States, 287 U.S. 435, 441, 53 S.Ct. 210, 77 L.Ed. 413 (1932)); however, as aptly stated in the leading case of Butts v. United States, 273 F. 35, 38 (CCA 1921) a decision quoted and approved in *Sorrells*,

"(t)he first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it.

get back to the Mainland. He came up to my house and had two ten millimeter vials of hashish oil. He said he needed to sell them to get him and his wife back to the Mainland.

Q. What did you say to Mr. Clark?

A. I told him about Kerry's call and his friends coming from Kauai and if Kerry called, I would put them in touch with each other.

Q. Were you going to buy the hashish oil from Ray Clark and sell it to Kerry Lee?

A. No. I was just trying to put them both together so they could take care of it.

Q. Did Kerry Lee contact you again subsequently to your meeting with Mr. Clark?

A. On approximately February 15th or 14th, he called and asked about any kind of drugs he could get for his friend. I told him about Ray being here. He said his friend from Kauai had not come and he would have to wait; he would call back later. I told him—

THE COURT: This friend from Kauai did not come?

THE WITNESS: No, not on that particular day.

Q. (By Mr. Hoskins) All right. Following this call from Kerry Lee, what did you say next to Ray Clark?

A. I told Ray that Kerry would be interested in the oil but was not ready to purchase it. Ray said he would leave the oil in the house in case Kerry came by. Kerry called approximately February 15th and said his friend was coming the next day from Kauai.

Q. All right. What happened on the 16th?

A. February 16th, in the late afternoon, Kerry called and said his friend was in. I was alone in the house with Larry Walker and myself. I told him Ray was not at home, but the oil was here. He came up to the house with the agent and purchased the oil.

Q. Did the agent ask about the possibility of buying further quantities of the substance?

A. Yes.

Q. What did you say?

A. I said it had come from the West Coast and there was not any more.

Q. Then what happened?

A. The agents left.

Q. What did you do with the money?

A. I put it in Ray's room where he was staying and waited for him to return.

Q. And, did you keep any of that money?

A. I gave all of it to Ray. He in turn, gave me $22 and a small amount of oil.

Q. Did you ask Ray to pay you for your services?

A. No.

Q. Did you expect to be paid for your services?

A. No, I didn't.

Q. Did you keep the $22 that he gave you?

A. Yes, I did.

Q. Do you know why he gave you $22?

A. He said he needed the rest of the money to get back to the Mainland with his wife.

\* \* \* \* \*

Q. Mr. Ewbank, why did you sell the hashish oil to Mr. Aiu on February 16, 1972?

A. I had known Kerry for approximately eight months. And, in that time he had been asking me to do smuggling and things involving big money making, things I was very afraid of; and, I had never dealt in narcotics. At the time I felt obligated to him to do the favor for him. He said it was a personal smoking arrangement with his friend that he had known for a long time. It's the only reason I would have done it.

Q. So, prior to February 16, 1972, had you sold narcotics to anyone else?

A. Never."

Here the evidence strongly tends to prove, if it does not conclusively do so, that their first and chief endeavor was to cause, to create, crime in order to punish it, and it is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense the like of which he had never been guilty in thought or in deed and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it."

The judgment ought to be reversed.