UNITED STATES of America

v.

**James B. BORUM, Appellant.**

**No. 76–1879.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1977.

Decided June 29, 1978.

As Amended July 5 and Oct. 20, 1978.

---

MacKinnon, Circuit Judge, filed a dissenting opinion.

John G. Gill, Jr., Rockville, Md. (appointed by this Court), with whom Chris Marder, Rockville, Md., was on brief, for appellant.

Thomas G. Corcoran, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Peter Mueller, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

Dissenting opinion filed by MacKINNON, Circuit Judge.

LEVENTHAL, Circuit Judge:

Appellant, James B. Borum, was found guilty on three counts dealing with his sale of a stolen pistol to police undercover agents. Those counts were (1) receipt of a firearm by a convicted felon (18 U.S.C. § 922(h)); (2) carrying a dangerous weapon without a license (D.C.Code § 22–3204); and (3) receiving stolen property (D.C.Code § 22–2205). The judgment imposed concurrent sentences, of five years on count one and 1-year terms on the other charges. The sentences were ordered to run consecutively to two concurrent 10-year sentences imposed the same day in another case.[1]

We agree with appellant's contention that the trial court erred in not instructing the jury on the defense of entrapment. We reverse and remand for a new trial.

---

1. In Criminal 76–176 the appellant pleaded guilty to receiving stolen property and selling stolen government property.

## I. TRIAL COURT RECORD

This case arises out of what has popularly become known as the District of Columbia's "Sting" operation, an undercover fencing operation conducted by the Washington Metropolitan Police Department and the FBI at 2254 25th Place, N.E., from October 1, 1975, to late February 1976. Policemen bought stolen goods and contraband from individuals and recorded the transactions on video tape. It is undisputed that on February 3, 1976, the appellant sold a pistol to Detective Patrick J. Lilly, who posed as Pasqualle LaRocca, the boss of the undercover fencing operation.

According to Detective Lilly's testimony at trial, the appellant was a regular customer at the fencing operation. He made approximately 27 visits during a three month period, sometimes twice a day. On no occasion other than February 3 did the appellant attempt to sell a gun.

A prime objective of the fencing operation, known as P.F.F., Inc., was to get unregistered and stolen guns off the street. The operators of P.F.F., Inc., therefore encouraged customers to bring in guns. Detective Lilly testified that when he asked the appellant for guns in November of 1975, the appellant told him (i. e., told Pasqualle LaRocca) that "he doesn't like to get guns, doesn't like to take the guns because he doesn't want to get stuck with the guns." (Trial Tr. 104).

The appellant testified that government agents discussed guns with him some 20 times. He testified on voir dire that during his first visit the agents asked him if he carried a gun. When appellant said that he did not carry guns, an agent responded, "Well, we take guns, take all you can bring us and pay top dollar for them." (Trial Tr. 151.) A video tape film taken during one of the transactions with the appellant shows the government agent saying "Bring me guns. Bring in any kind of guns."

According to the appellant, on his visit immediately before the pistol transaction, he was told that the fencing operation was not going to deal in credit cards—one of appellant's staple items. The agents added,

"What about bringing us some guns? We know that you get hold of them but you're not bringing them to us. . . ." (Trial Tr. 153.) Appellant declined to bring them a gun. He told them at that time that he did not "mess" with guns because he knew that with his prior felony conviction, he would face a stiff penalty if he was caught with them.

As to the offense for which he was charged and convicted, the appellant testified at trial that on February 3, 1976, he went to 14th and T Streets, N.W., to "cop," i. e., to inject heroin. While in a room with nine other men, appellant was approached by one Melvin Sales. According to testimony, Sales had some credit cards that he wanted appellant to fence. Appellant called LaRocca (Detective Lilly) to see if he was interested in credit cards, and was told that LaRocca was not interested in credit cards but would be in the market for a "trailer truck and guns." Appellant told Sales that LaRocca did not want the credit cards. Appellant then called P.F.F., Inc., again to see if they were interested in a television and some other items. The response was the same. Finally, according to appellant, Sales told Borum that he had a pistol at his home. Appellant sold that pistol to P.F.F., Inc., along with a number of other items.

The government's evidence showed that the pistol was stolen from the parked car of a Mr. Joseph R. Traver some time between January 31, 1976, and February 2, 1976. There is no evidence in the record that Borum ever used the firearm. Nor is there evidence that he ever carried or used firearms in the past.

All of the appellant's testimony was given out of the presence of the jury. In describing his state of mind on February 3, 1976, the appellant testified that he thought that he was dealing with the Mafia. The people at P.F.F., Inc., had lent him money "to buy stuff" or "do whatever [he] wanted" (Tr. 156); he knew he would have to pay the loans back and he did not want to antagonize them. Moreover, appellant claimed that he needed the money that day,

the inference being that he needed the money for his drug habit. He thought that by bringing the gun, he might find the fence operators more receptive to purchasing other items as well. P.F.F., Inc., did in fact buy other items from appellant that day.

After hearing this testimony, the trial court announced that it would not give the jury an instruction on entrapment. The appellant appeals that ruling in this court.

## II. THE ENTRAPMENT DEFENSE

This court is not authorized to decide the factual question whether appellant was indeed entrapped, but only the legal question whether the trial judge should have given the jury an entrapment instruction. " '[I]n deciding whether a jury question is raised, the trial judge must consider the evidence in the light most favorable to the defendant.' " *United States v. Boone*, 177 U.S. App.D.C. 265, 267, 543 F.2d 412, 414 (1976) (quoting *United States v. Anglada*, 524 F.2d 296, 298 (2d Cir. 1975)).

For purposes of this appeal, we must assume that the appellant's version of his dealings with P.F.F., Inc., is true, and that the salient facts are as follows: The appellant visited P.F.F., Inc., some 27 times. On 20 occasions the fence operators solicited guns. Appellant consistently expressed an unwillingness to handle guns, an unwillingness strengthened by his knowledge of the stiff penalties imposed on felons who illegally possess firearms. There is no evidence that the appellant ever used or carried firearms. He was informed in January that the fence was not interested in credit cards. On February 3, the fence rejected his offer of credit cards and expressed an interest in trailer trucks and guns. The appellant, in search of money to support his drug habit, then brought the fence operators a pistol he obtained from Melvin Sales. He feared the operators of the fence and did not want to alienate them.

■ The elements of the defense of entrapment are (1) inducement by the government, and (2) a lack of predisposition on the part of the defendant. The classic statement of Judge Learned Hand in *United States v. Sherman*, 200 F.2d 880, 882–83 (2d Cir. 1952), puts these two elements as follows: (1) "did the agent induce the accused to commit the offence," and, if so, (2) "was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it."

■ These themes are confirmed in the Supreme Court opinions on entrapment. The initial Supreme Court decision projecting the defense of entrapment, a judge-made defense put forward as implicit in the legislative definition of a crime, was *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). In *Sorrells* Chief Justice Hughes stated that "the defense of entrapment is not simply that the particular act was committed at the instance of government officials. . . . The predisposition and criminal design of the defendant are relevant." *Id.* at 451, 53 S.Ct. at 216. The vitality of the *Sorrells* ruling was confirmed in *Sherman v. United States*, 356 U.S. 369, 372–73, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), and *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), which stated that the principal element in the defense of entrapment is the defendant's predisposition to commit the crime. While predisposition is the key issue, it does not totally subsume the question of inducement, for separate consideration of the inducement issue illuminates one critical, additional element of the entrapment defense: instigation of the criminal act by government agents.[2]

---

**2.** A majority of the Supreme Court Justices hold open the possibility that even where there is predisposition on the part of the defendant, a conviction may be barred under the Court's supervisory power in instances of "outrageous police conduct." *Hampton v. United States,* 425 U.S. 484, 491–95, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (Justices Powell and Blackmun concurring); *id.* at 495–500, 96 S.Ct. 1646 (Justices Brennan, Stewart and Marshall dissenting). Justice Rehnquist, joined by the Chief Justice and Justice White, was of the view that in

There is sufficient evidence in the record for a jury to find both "inducement" by government agents and lack of predisposition on the part of appellant Borum.

It was the government agents who first asked appellant to get guns and they asked him about guns some twenty times; he only obtained and sold the gun when the operators of P.F.F., Inc., said they would not take his other offerings.

In *Sorrells* itself the Supreme Court was confronted with less evidence of inducement than we have in this case. *Sorrells* involved a conviction for possession and sale of liquor. There the agent asked the defendant three to five times if he could obtain liquor in the course of a 60 to 90 minute discussion. The agent had also been in the same WWI army division as the defendant, although they were not acquaintances. The Court held there was sufficient inducement for putting the entrapment issue before the jury. The Court found evidence of inducement in this "repeated and persistent solicitation." 287 U.S. at 441, 53 S.Ct. 210.

In *Russell* the Supreme Court referred to its two earlier cases on entrapment. It described *Sorrells* as a case where there were two refusals of the agent's request and "upon asking a third time the defendant finally capitulated." 411 U.S. at 428, 93 S.Ct. at 1641. *Sherman* is described as a case where "despite initial reluctance, the defendant finally acceded to the repeated importunings of the agent to commit the criminal act." *Id.* at 429, 93 S.Ct. at 1641.

The existence of evidence on inducement sufficient to go to the jury is made out by the government initiation and repeated solicitation of the sale of a pistol.[3]

The government argues that in this case there was no evidence of entrapment, since the role of the law enforcement agents was no more than " 'solicitation—the providing of opportunity.' "[4] If this were a case of mere solicitation, the government's contention would have some force. Recent cases establish that if all that is shown is that an enforcement official made an offer, usually to buy, and the defendant acquiesced with reasonable readiness, the defense of entrapment is not made out.[5]

There is some early precedent for the proposition that "inducement" is established if the government agent was the first to suggest the crime and that the burden was then on the government to prove predisposition. *E. g., Sagansky v. United States,* 358 F.2d 195, 202 (1st Cir.), *cert. denied,* 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966). In *Kadis v. United States,* 373 F.2d 370, 373–74 (1st Cir. 1967), the same panel that decided *Sagansky* concluded that it was a mistake to treat inducement as a separate issue, and held that the defendant must go on to make an initial showing of his "unreadiness" to commit the crime before the

cases of predisposition, even due process claims could not be raised on the ground of outrageous police conduct. Justice Stevens did not participate. *See also United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

**3.** The jury would also be advised of both appellant's need to finance a drug habit and his fear of the fences, who represented themselves as organized crime operatives and whom appellant did not want to offend. There is no need in this opinion to reflect on the sufficiency or weight of this additional testimony.

**4.** Brief for Appellee at 11, quoting *United States v. DeVore,* 423 F.2d 1069, 1072 (4th Cir. 1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971).

The case at bar is clearly different from *United States v. Virciglio,* 441 F.2d 1295 (5th Cir. 1971), which followed *DeVore.* Virciglio claimed he was entrapped as a matter of law, whereas we hold only that Borum was entitled to go to the jury. More importantly, on the very first meeting when the agent asked Virciglio if he had a machine gun for sale, Virciglio replied that he did not but that he would try to get one. 441 F.2d at 1297. Borum's is a case of repeated solicitation of the sale of a pistol.

**5.** *E. g., United States v. Townsend,* 555 F.2d 152, 157 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977); *United States v. Reynoso-Ulloa,* 548 F.2d 1329, 1336 (9th Cir. 1977); *United States v. Reed,* 526 F.2d 740, 743 (2d Cir. 1975), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976); *United States v. Dickens,* 524 F.2d 441, 444 (5th Cir. 1975), *cert. denied,* 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976).

burden is shifted to the government to show predisposition. This carried forward the intermediate ruling of Judge Friendly for the Second Circuit in *United States v. Riley,* 363 F.2d 955 (2d Cir. 1966), that there was no need for an entrapment charge if the evidence showed the accused was "ready and willing without persuasion." Judge Friendly continued:

> On the other hand, the production of any evidence negating propensity, whether in cross-examination or otherwise, requires submission to the jury, however unreasonable the judge would consider a verdict in favor of the defendant to be.

*Id.* at 959.

In *United States v. Boone,* 177 U.S.App. D.C. 265, 268, 543 F.2d 412, 415 (1976), this Court accepted as the appropriate rule the Second Circuit's pronouncement in *Riley.* We noted that the *Riley* formulation had been reiterated in *United States v. Anglada,* 524 F.2d 296 (2d Cir. 1975), with full awareness of the " 'reluctance of a trial judge to charge on entrapment "when he believes the defense is concocted" and the defendant is guilty.' " [6]

That leaves the question of the existence of evidence "negating propensity." In *Boone,* as in this case, the government invoked *DeVore, see* note 4 *supra,* and argued the agent's role was only one of solicitation and opportunity.[7] We found sufficient evidence negating propensity to require the entrapment charge.[8]

The government cites *Fletcher v. United States,* 111 U.S.App.D.C. 192, 295 F.2d 179 (1961), *cert. denied,* 368 U.S. 993, 82 S.Ct. 613, 7 L.Ed.2d 530 (1962), as requiring evidence of pressure "by promises, threats, pleas of urgent need or otherwise" as a precondition to an entrapment instruction. 111 U.S.App.D.C. at 194, 295 F.2d at 181. But the key to the *Fletcher* opinion was that there "was no showing of the slightest reluctance on the part of the appellant to make the deal," no evidence that the police "had induced an otherwise unwilling person to commit a criminal act." *Id.*

In the case at bar, in contrast, we have testimony that the defendant on several occasions indicated his unwillingness to deal with guns. There was no evidence that the appellant had dealt with guns in the past. He testified that he appreciated the penalties he would receive if he were caught possessing or selling a gun. The opinions in *Sorrells, Sherman* and *Russell* plainly establish the materiality, in terms of negativing predisposition, of the expressed reluctance of defendant, and of the fact that the defendant capitulates or accedes only in the context of repeated solicitations by law enforcement agents.[9]

■ The government argues that since there was undisputed predisposition to fence stolen merchandise, the defendant could not claim immunity from prosecution for what is "essentially" the same offense, illegal possession of merchandise, "so that no distinction should be drawn with respect to propensity." [10] But the entrapment decisions speak in terms of a "defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government." *United States v. Russell,* 411 U.S. at 435, 93 S.Ct. at 1644.

---

6. 543 F.2d at 414, *quoting United States v. Anglada,* 524 F.2d 296, 298 (2d Cir. 1975).

7. 543 F.2d at 413.

8. In *Boone* the defendant testified that he had accompanied the government agent during the narcotics transaction to protect the agent from being robbed or beaten. *Id.* at 412–13.

9. This case is therefore distinguishable from *United States v. Brooks,* 185 U.S.App.D.C. 267, 271, 567 F.2d 134, 138, 142 (1977). In that case the government agents made persistent requests to defendant to bring people with guns, but this was not in the face of expressed reluc-

tance on the part of defendant to comply with such requests. Borum's reluctance was communicated to the agents at the time of their requests (as the government agents acknowledged in the testimony in the present record), and the government agents sought to override that reluctance by redoubling their requests. Our opinion in the present case is not meant to stand for the proposition that frequent solicitation by government agents is by itself enough to require an entrapment instruction.

10. Brief for Appellee at 11 n.7.

In the instant case, appellant's contention is not "hypertechnical", as the government puts it.[11] He was aware of the extra penalties imposed on convicted felons for receipt of firearms, and he voiced this particular concern to the undercover agents. The pertinent statute makes it unlawful for a person "who has been convicted in any court of . . . a crime punishable by imprisonment for a term exceeding one year . . . to receive any firearm . . . transported in interstate or foreign commerce." 18 U.S.C. § 922(h) (1976). In this context, the government cannot fairly say that a gun was just like any other item.[12]

The case is reversed and remanded to give the defendant an opportunity to present the entrapment defense to a jury.

*So ordered.*

MacKINNON, Circuit Judge, dissenting:

Because it is my conclusion that the evidence, as a matter of law, shows that Borum was not entrapped to receive a firearm shipped in interstate commerce and to possess same without a license, I respectfully dissent from the decision of the majority opinion.

The court argues that the police in the course of operating their undercover "fence," "the Sting," entrapped Borum to commit these firearms offenses merely by telling him on several occasions when he voluntarily came to sell stolen goods that they would also purchase guns. In making these suggestions, however, the Sting did nothing more than "provide an opportunity" for appellant to exercise his felonious intentions which—as opposed to actual "inducement"—by the great weight of authority, falls outside the purview of the entrapment doctrine. *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Gardner,* 516 F.2d 334 (7th Cir.), *cert. denied,* 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975); *United States v. Hill,* 469 F.2d 673 (10th

Cir. 1972), *cert. denied,* 410 U.S. 939, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1973); *United States v. Basey,* 468 F.2d 194 (9th Cir. 1972), *cert. denied,* 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973); *Chatman v. United States,* 411 F.2d 1139 (9th Cir. 1969); *United States v. Soles,* 401 F.2d 521 (6th Cir. 1968), *cert. denied sub nom. Nelson v. United States,* 394 U.S. 931, 89 S.Ct. 1201, 22 L.Ed.2d 461 (1969).

This would be quite a different case had the police, instead of merely waiting to see what contraband Borum might bring to them, approached the defendant with stolen guns and urged him to find some "fence" to buy them, whereupon Borum proceeded to fence these guns with the "Sting." *Cf. United States v. Oquendo,* 490 F.2d 161 (5th Cir. 1974). In actuality, however, the police *never* approached Borum. He came to the Sting completely unsolicited, as a confirmed burglar fencing a variety of stolen goods for a small part of their actual value. In the course of dealing with appellant, the officers running the Sting discussed what types of articles they were interested in purchasing, and he returned any number of times voluntarily and completely on his own to sell such goods. Borum dealt with the Sting solely because it afforded him a market for the fruits of his larcenies, not because the police prodded him to do so. As he testified, he had "about 20 . . . conversations about guns" with the Sting. "Most of the time I called them" (Tr. 152). The Sting, thus, merely afforded the defendant a chance to profit by violating the law; a chance which he eagerly embraced and to which he was preeminently predisposed. *Compare Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). *Lutfy v. United States,* 198 F.2d 760 (9th Cir. 1952).

In this case it must be remembered that the predisposition we are talking about is the predisposition to possess guns. It was the mere possession of a gun that formed

---

11. *Id.*

12. We have no occasion to pass on whether an entrapment instruction would have been re-

quired if the case involved only the offense of receipt of stolen property.

the *corpus delicti* of the two offenses of which he was convicted. Apparently Borum was not only a thief; he also operated as an intermediary for others wishing to fence various articles.[1] According to his own testimony he was always running across men who wanted to buy and sell guns, but his reluctance to do so himself was, as he said, because he didn't want to get stuck with the guns—i. e. not be able to sell them. When a sure sale and a good price was guaranteed, Borum said he was "Solid." This seems a clear admission of predisposition to sell guns if he were assured of a ready market. And implicit in this wider predisposition is the necessarily involved predisposition to possess guns whether owned by him or others. Thus it was no surprise when a friend of his wanted to sell credit cards or a TV, and both offers were turned down, that Borum called back a third time and inquired if the Sting would buy a "pistol." When the reply was affirmative, instead of sending his friend (Melvin Sales) who had the gun alone, Borum went along with him in order to share in the price. Borum's predisposition to handle guns under such circumstances is apparent and his own testimony convicts him on that score:

> And I went uptown to cop. And I think I went with somebody. Got a quarter or whatever it was. It was about nine of us in a room sitting around all. And Melvin Sales came in and he had some credit cards. But I didn't know at the time that he had a TV and some radio or something. But anyway, it was a bunch of things he had.

1. The proffer by the prosecution at a bench conference of a tape recording of Borum's conversation with the Sting ran as follows:

   Lilly: "Run across any guns?"
   Borum: "Ah, yes, I am always running across dudes that wants to buy them and sell them, but I don't want to buy them and get stuck with them."
   Lilly: "You ain't going to get stuck with them if you get them and bring them to me."
   Borum: "What do you get for a gun?"
   Lilly: "I give you pretty good money. You just bring it in and let me see it. I can't buy something until I look at it, see what it looks like."

But the only thing I knew at the time, he had some credit cards. So, he told me that I know where to offer them. I said yes.

So, I went up and got on the phone and I called over to Pat's. And Pat—I told him I had—he asked what did I have. I said I had some credit cards.

So, he said, "I ain't talking no more credit cards. You should know that" or something to that effect. So, he said, "Is that all you got?"

I said, "Yes".

Well, he said, "Well, I ain't taking no credit cards. Bring me a trailer truck or some guns."

I said, "Okay." So, I hang up.

So, I relayed the message to Melvin. So, Melvin said he had a TV and some other items. So, he wanted me to call back.

So, I called him back again. So, I told me [him?] what I had this time. He said no, he wasn't taking anything. He told me what he wanted, and that's all he was going to take.

So, I relayed the message back to Melvin again. So, Melvin said, "Well, I got a pistol."

So, I said, "If you got a pistol, he'll take the pistol."

He said, "Come on, take me past the house."

So, we put all the stuff in my car, went past his house, picked up the pistol, and I went back—no, I called from the gasoline station on Bladensburg Road, and he asked me what did I have. I said, "I got a pistol." So, he said, "Come on up."

   Borum: "I understand that."
   Borum: "No, I am not saying, like if, ah, it's a .38 you know."
   Lilly: "Bring in any kind of gun you get your hands on. I will buy it. I guarantee it, and I guarantee you a good f___ing price."
   Borum: "Solid."
Tr. 134. This proffer was not objected to and it was permissible for the court to consider it in connection with its decision to deny a charge on entrapment. Had an entrapment instruction been given the above testimony would have been admissible and would have been very damaging to Borum.

So, I went up there and I had the pistol and the other stuff because I figured he wasn't going to turn it down if I had the pistol.

So, that's how it came about.

Tr. 154–156. It is also a fact not to be ignored that Borum's accomplice (Sales) *already* had the pistol—the opportunity to sell it merely caused the existing evidence to surface. No new crime was committed by Sales, and to a certain extent Borum initially aided and abetted Sales' offenses and subsequently committed his own individual offenses.

There is a possibility that Borum might never have been in possession of a gun if he had not been afforded an opportunity to sell it, but it is a perversion of the American language and the American law to suggest that therefore he was "induced" to commit the crimes of which he was convicted. It is firmly established that simple solicitation, and much less mere affording of an opportunity, does not amount to such inducement as gives rise to an entrapment defense, *see, e. g., United States v. Perry,* 478 F.2d 1276 (7th Cir.), *cert. denied,* 414 U.S. 1005, 94 S.Ct. 363, 38 L.Ed.2d 241 (1973); *United States v. Tharpe,* 443 F.2d 12 (4th Cir.), *cert. denied,* 404 U.S. 866, 92 S.Ct. 80, 30 L.Ed.2d 110 (1971); *United States v. Barash,* 412 F.2d 26 (2d Cir.), *cert. denied,* 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969); but compare, *United States v. Licursi,* 525 F.2d 1164, 1168 (2d Cir. 1975) (and cases cited therein). In apparent disregard of such compelling authority, the court seems to have confused "inducement" with a more passive concept, perhaps best described simply as a temptation. In so doing the court glosses over the point that entrapment can only be present where the police action is actually "creative" of the defendant's criminal intent, *see Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), rather than merely supplying a facility for its activity, *see, e. g., Chatman v. United States, supra.* Justice Harlan aptly observed that "the defense of entrapment is concerned [with] the manufacturing of crime by law enforcement officials and their agents." *Lopez v. United States,* 373 U.S. 427, 434, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462 (1963). But Borum was no innocent victim.

The Government's role in the interplay between the Sting and Borum was significantly passive. There was never any attempt to urge or persuade or to influence the reason or judgment of Borum. It is recognized that in those cases where the criminal activity in which the defendant was allegedly entrapped is itself minimal, "relatively slight" inducement may suffice to require an entrapment instruction, *see, e. g., United States v. Boone,* 177 U.S.App. D.C. 265, 543 F.2d 412 (1976); *United States v. Viviano,* 437 F.2d 295, 299 (2d Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971); *United States v. Weiser,* 428 F.2d 932, 934 (2d Cir. 1969), *cert. denied,* 402 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971). Here, however, there is no indication of any actual "inducement" at all. The defendant thus has not presented sufficient evidence to justify the court placing the issue before the jury by an instruction on entrapment. "[A]s a matter of law, no entrapment takes place merely by a Government informer's asking to purchase contraband articles." *Kibby v. United States,* 372 F.2d 598, 602 (8th Cir.), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2055, 18 L.Ed.2d 993 (1967), and cases cited therein.

The active party in Borum's contact with the "fence" was plainly the defendant himself. It was he who first went to the Sting and made the initial overtures, and he who continued voluntarily and repeatedly to renew this contact—some 27 times in three months, *cf. United States v. Haden,* 397 F.2d 460 (7th Cir.), *cert. denied,* 396 U.S. 1027, 90 S.Ct. 574, 24 L.Ed.2d 523 (1968). On facts much less favorable to the Government than these, one would be hard put to deny that a defendant's conduct had become sufficiently independent and derivative from his own initiative that even the most credulous would be forced to refuse to believe that the "criminal design originated in the mind of the officer" not of the de-

fendant. Such a conclusion is particularly ineluctable in the present case where Borum has proven himself to be a confirmed thief and has admitted to regularly possessing and trafficking in various contraband and stolen articles. *Cf. Sorrells v. United States, supra,* 287 U.S. at 442, 53 S.Ct. 210; *United States v. Anders,* 485 F.2d 562 (5th Cir. 1973); *Beatty v. United States,* 377 F.2d 181 (5th Cir.), *rev'd on other grounds,* 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967).

I do not, of course, understand the majority to suggest that all of Borum's dealings with the Sting were "induced" by the police, but only that he may have been entrapped by the officers specifically into dealing with guns, a crime which it is alleged he was not predisposed to commit. Although this position lacks the patent absurdity of any suggestion that Borum's general dealings in stolen goods were "induced," I nevertheless cannot agree that where law enforcement officials merely operate a passive, purchasing operation involving stolen property that such activity is transformed into illegitimate inducement to possess guns merely because the supposed "fence" indicates that he is only interested in certain merchandise and suggests that such items would command a good price. That is nothing more than affording an opportunity. *Cf. United States v. Virciglio,* 441 F.2d 1295 (5th Cir. 1971).

Moreover, Borum was charged only with possessing a gun and stolen property so that there is no need for the Government to show that he was predisposed actually to deal in guns (which might be difficult), but rather only that he was predisposed to possess them. The suggestion that while he was disposed generally to sell stolen goods, he was not predisposed to sell stolen *guns* misstates the nature of this case and misconstrues the crimes for which Borum was convicted. As long as it is shown—and there is abundant evidence so indicating—that Borum was sufficiently predisposed to possess guns if he was afforded a ready market for them, no further predisposition is needed.

In this case, the police exerted so little influence on the defendant that it is difficult to imagine how his acts could be said to proceed from anything other than his own predisposition. There is no question that the police on several occasions told the defendant they were interested in purchasing guns, but they did so *only* when he voluntarily contacted them to discuss the possible sale of various other stolen articles. The police never approached Borum on any matter. This case does not involve the "repeated and persistent solicitation" characteristic of entrapment, *see Sorrells v. United States, supra,* 287 U.S. at 411, 53 S.Ct. 210; *United States v. Ewbank,* 483 F.2d 1149 (9th Cir. 1973). What the police offered Borum was merely an "opportunity," and his eventual sale of an illegal weapon was the result of his free decision to take advantage of that opportunity. Of course, had the Sting on this particular day stated that they were interested in stolen credit cards, Borum might not have resorted to the sale of the pistol, but the mere refusal to buy one species of stolen property does not constitute entrapment into selling—and much less into possessing—something else. The point remains that it was the defendant himself who decided without any persuasion that he would sell what the Sting offered to buy.

Moreover, in my view, the court has misapprehended the nature of the predisposition which the Government must show in this case. Borum was a confirmed thief predisposed to steal or acquire any stolen article in order to fence it and obtain the best price he could. There is, in this respect, nothing unique about his possession of a stolen gun as opposed to, for example, diamonds or currency. The law may attach special penalties to the possession of illegal firearms, but when an individual makes his livelihood from fencing stolen merchandise, he seems predisposed to provide (and hence to possess) such articles in general. There may be some situations in which a general predisposition to steal and fence would not imply a predisposition to do so with certain articles—for example, an individual who is readily willing to sell guns may not be to

sell national secrets—but at the very least, on the facts of this case, it seems overly nice to dispute that a general predisposition on the part of Borum to fence stolen goods would not at least suggest a similar attitude—if the price was right—towards possessing guns to sell them. Appellant's reluctance to sell firearms seems to have been indicative more of the hazards of doing so than to any lack of predisposition to possess them so as to profit by that particular felony.

The court makes much of Borum's subsequently stated reluctance to deal in firearms because of his knowledge of the heavy penalties consequent upon a convicted felon being apprehended in possession of a gun, by way of suggesting that he would not have overcome his reluctance but for some suasion by the police. But there is not an iota of evidence that the suasion *ever* exceeded "opportunity." That Borum overcame his initial hesitation, demonstrates nothing more than at some point the mere opportunity to obtain the "top dollar" paid for firearms overmastered his self-interested caution, a process which presumably takes place whenever any crime is committed for financial gain.

The mere fact that at a certain point Borum considered it worthwhile to commit the crime of possession in furtherance of a crime that he was initially reluctant to commit is not evidence that supports an inference of inducement. Borum was just like the confirmed poker player who regularly played in the crooked game, although he would have preferred an honest one, because the former was the only game in town. During the three months that it took for him to decide to sell a gun (and incidentally to possess it) the subject of firearms purchases was mentioned slightly less than twice a week and then only after the defendant himself voluntarily appeared at the Sting and initiated the discussion as to what the Sting would buy [2]—a situation far different from the "hard sell" tactics that

are required for the inducement that leads to entrapment, *see, e. g., Sorrells v. United States, supra; Lutfy v. United States, supra.* We are not confronted here with any browbeating or intimidation by the police, but only with an individual who, as his circumstances changed, became willing to take advantage of an opportunity that prudence had earlier persuaded him to avoid.

The court's opinion asserts that this case is distinguishable from *United States v. Brooks,* 185 U.S.App.D.C. 267, 567 F.2d 134 (1977) because *Brooks* did not involve the government "redoubling their requests . . . in the face of expressed reluctance on the part of defendant to comply with such requests." *Neither does this case.* The testimony here does *not* support an assertion that the Sting redoubled his requests. Rather, when Borum persisted in his continuing attempts to fence other stolen articles the Sting merely repeated its statement that it would not buy such articles but would buy a trailer or guns. This was practically the same situation as existed in *Brooks* where we found that the record presented not "even a colorable contention that Hazel [a defendant] was an innocent person instigated to crime by the police, who implanted in his mind the disposition to violate the law," 185 U.S.App.D.C. at 271, 567 F.2d at 138.

In the face of Borum's admission that he frequently came in contact with guns, *supra* n. 1, it is hard to see how one already engaged, or at least in contact with others who were themselves engaged, in crimes involving guns can be said not to be predisposed to commit that crime. The fact that he "expressed reluctance" does not compel an entrapment instruction unless such reluctance was overborne by inducement, which is not shown here. His reluctance was not based on moral principles and was easily overcome when his own cupidity induced him to perform such acts. He then eagerly and repeatedly called the Sting to

---

2. Tr. 151–154. The appellant was "asked about guns" by the officers operating the Sting approximately twenty times from late November until February 3 when he sold a firearm to them. Appellant's Brief at 5–6.

make all the arrangements for just such a crime as he had previously "expressed reluctance" to commit. His own testimony, pp. ——–—— of 189 U.S.App.D.C., pp. 431–432 of 584 F.2d, *supra,* clearly shows that the influence that caused Borum to overcome his reluctance was his desire for money; the police officers involved merely remained available as the passive instrument of his felonies:

> [When asked why on the one occasion in question and no other he brought a firearm to the Sting, Borum replied] Because they said they wasn't taking any credit cards or anything else that I might have brought. And I knew that eventually that day I would have to have some money. And they said to bring pistols that's all they was taking. So, I brought the pistol. (Tr. 157)

If prior "reluctance" in such circumstances is sufficient to merit an entrapment instruction, then the deterrent element in criminal penalties would make such an instruction necessary in virtually all cases involving undercover police activity.

Turning from the "predisposition" prong of the entrapment doctrine to that focusing on the amount of police "inducement," again it is the similarity between the dealings of the defendants with the police in *Brooks* and in the instant case, not the differences, which stand out. It is true that Borum made some twenty-seven visits to the Sting, all of them voluntarily whereas the defendant in *Brooks* made only eighteen. However, this seems to be a difference without distinction. If anything, it indicates more disposition to crime in *Borum.* Certainly the fact that the police told one defendant eighteen and another twenty-seven times that they were interested primarily in purchasing guns—particularly when it was the individual criminal himself who determined how many times he would talk to the· Sting—does not constitute a meaningful difference in the degree to which the two defendants were induced to commit their respective crimes. The

Sting's failure to accommodate the defendant's preferred method of obtaining funds by retailing the fruits of his larcenies, and those of his friends, does not amount to the inducement necessary to permit an entrapment instruction. The *inducement* that is necessary to justify an entrapment instruction must be something akin to:

> persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship. A solicitation, request or approach by law enforcement officials to engage in criminal activity, standing alone, is not an inducement.
>
>     ·   ·   ·

*Criminal Jury Instructions for the District of Columbia,* Instruction 5.05 Entrapment (3d ed. 1978).

The inducement necessary to require an entrapment instruction may consist in pleas "predicated on . . . presumed suffering" that amount to "enticement," *Sherman v. United States,* 356 U.S. 369, 371, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), or in personal appeals to human sympathy, friendship, etc. *Sorrells v. United States,* 287 U.S. 435, 439–440, 53 S.Ct. 210, 77 L.Ed. 413 (1932). The court's reliance here on these two cases is misplaced, Maj. op. p. —— of 189 U.S.App. D.C., p. 429 of 584 F.2d, as no such inducement was indulged in here. The court's reliance on *United States v. Russell,* Maj. op. p. —— of 189 U.S.App.D.C., p. 429 of 584 F.2d, is even more contrary to its holding. *Russell* held that the defendants were *not* entrapped even though the government voluntarily furnished the critical ingredients necessary to manufacture a contraband drug. It would be hard to find a case that would furnish less support for the court's position than *Russell.*

It may be true, but irrelevant, that Borum's desire for money was fueled by the mandates of addiction, not merely the more mundane aspects of greed. While addiction may contribute to one's predisposition to commit crimes, it is not a legal defense to the consequences thereof. The majority

goes beyond the law in so asserting. Surprisingly, the court insists that the jury should be instructed to consider the fact that Borum was an addict, and that it may infer—without any evidence on the point—that he therefore had a pressing, indeed literally an overwhelming physical, need for money (parenthetically, in actuality the overpowering strength of all addiction is a common misconception, and in fact the condition does not exist in all addicts). We are not pointed to and have been unable to find that any court has ever instructed a jury that narcotics addiction may negate predisposition. It is submitted that the court is grossly in error in this respect. Moreover, Borum's addiction cuts both ways. If he were short of funds, that fact might magnify the effect and hence the potential illegality of any "inducement" by the police. It would, however, also suggest that he was *predisposed* to do anything to obtain funds to purchase narcotics, and thus arguing that the police *induced* his crime is fantastical.

Furthermore, I cannot concur in the court's implication that the financial exigencies of addiction—or any other subjective characteristic of a defendant—can transform mere opportunity into inducement. Addiction might make one more willing to grasp "opportunity," but it in no way converts "opportunity" into impermissible inducement. To allow it to do so would be to allow individual infirmities to eviscerate the protection of the criminal law.

Here there is no evidence at all that the police even knew of, let alone exploited, Borum's addiction, and barring some showing of such manipulation, the court is wholly without justification for transmuting the passive, receiving activity of the police in this case into the "initiative," "creative," "persuasive" conduct which constitutes entrapment merely because defendant *might* have had a strong physical need for money. It is impermissible for the court to confuse internal compulsion with external inducement.

As a final point, I note that the court seems to place some weight on the fact that the defendant was "frightened" of the officers posing as leaders of the Sting. However, he was not apparently sufficiently frightened to avoid them or to be dissuaded from continually and voluntarily renewing contact with the persons whom he now alleges terrified him. Not only did Borum himself give few signs of actually being frightened, but also the conduct of the police was by no means excessively intimidating. The officers themselves never threatened Borum with any dire consequences should he not deal in guns; the furthest they went was simply to inform him that they would not purchase any other type of stolen property. The defendant may well have been afraid, but it was his greed, not his fear, that induced him to fence Sales' pistol. One would suspect that most criminals are frightened to some degree; fright alone by no means indicates that the police in this case *created* Borum's criminal intent.

The Supreme Court has admonished that in dealing with entrapment, "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal," *Sherman v. United States, supra,* 356 U.S. at 372, 78 S.Ct. at 821. The Sting on its face was no more than a trap for the predisposed criminal, and Borum, one of their most frequent "customers," could hardly be described as innocent. That he was unwary was his downfall.

More recently, the Court has reiterated that "entrapment is a relatively limited defense." *United States v. Russell, supra,* 411 U.S. at 435, 93 S.Ct. at 1644. The suggestion that entrapment was involved is out of place here. There is no indication that the police in the course of the Sting customarily overstepped the bounds of passivity and intruded into the area of entrapment, and in their dealings with Borum they certainly did not do so. Even if the most extreme view of entrapment, as expressed by Justice Brennan, is accepted, the facts here do not constitute such defense. In his dissent in

*Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), Justice Brennan postulated:

> If the police believe an individual is a distributor of narcotics, all that is required is to set up a "buy"; the putative pusher is worth the investigative effort only if he has ready access to a supply. See *United States v. Russell,* 411 U.S., at 448–449, [93 S.Ct., at 1650–1651, 36 L.Ed.2d, at 382–383] (Stewart, J., dissenting).

425 U.S. at 499–500 n. 3, 96 S.Ct. at 1655. Here the police knew that Borum possessed and sold stolen goods. He admitted he sometimes had access to guns.[3] Consequently all that the agents did was "set up a 'buy'," and the putative seller (Borum) took advantage of it by the ready access he had to a gun that was made available to him by Sales. This is not entrapment even by the standards of Justices Brennan, Marshall and Stewart, and this court should not attempt to make it so. 425 U.S. at 495–500, 96 S.Ct. 1646. Sales and Borum, here, between them, supplied their own inducement to the crimes with which they were charged. I challenge anyone to read Borum's testimony at pp. ——–—— of 189 U.S.App.D.C., pp. 431–432 of 584 F.2d, *supra,* and point out any inducement by the government. It would seem that *Russell* and *Hampton,* being so recent, would command respect and that further explication would not be necessary. I respectfully dissent.