T.C. Memo. 2003-200


UNITED STATES TAX COURT



BREWER QUALITY HOMES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 8222-99.                    Filed July 10, 2003.



       R disallowed deductions for portions of amounts P paid
to a shareholder-officer.

       <u>Held</u>: (1) Maximum amounts of reasonable compensation
(less than amounts P deducted, but greater than amounts R
determined) are redetermined.

       (2) The amounts so redetermined were paid as
compensation for personal services actually rendered and are
deductible.  The amounts P paid in excess of the amounts so
redetermined are not deductible.  Sec. 162(a)(1), I.R.C.
1986.



<u>R. Cody Mayo, Jr.</u>, for petitioner.

<u>Mary Beth Calkins</u> and <u>Joseph Ineich</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, Judge:  Respondent determined deficiencies in Federal corporate income tax against petitioner as follows:

| Year | Deficiency |
|------|-----------|
| 1995 | $123,602 |
| 1996 | 144,411 |

After concessions by respondent,[1] the issue for decision is the extent to which amounts that petitioner paid to Jack are deductible as reasonable compensation under section 162(a)(1).[2]

---

[1]  In the notice of deficiency, respondent disallowed (1) $338,941 of the $783,930 of officer compensation that petitioner paid to Jack R. Brewer, Sr. (hereinafter sometimes referred to as Jack), and Mary L. Brewer (hereinafter sometimes referred to as Mary) in 1995, and (2) $397,759 of the $881,559 of officer compensation that petitioner paid to Jack and Mary in 1996.

Respondent concedes that (1) all payments of officer compensation to Mary are deductible, and (2) additional portions of the payments to Jack are deductible.  After respondent's concessions, there remain in dispute only $158,069 of the original $338,941 disallowance for 1995, and only $337,593 of the original $397,759 disallowance for 1996.

[2]  Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1986 as in effect for the taxable years in issue.

## FINDINGS OF FACT[3]

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

Petitioner was incorporated in Louisiana on August 1, 1977. When its petition in the instant case was filed, petitioner's principal place of business was in Bossier City, Louisiana. Bossier City is in northwest Louisiana, on the east side of the Red River, across from Shreveport. Petitioner is located on Rte. US 80.

---

[3] Respondent's counsel complied with the detailed requirements of Rule 151(e)(3) as to proposed findings of fact in opening briefs; petitioner's counsel did not. As a result, respondent was deprived of the opportunity to explain why petitioner's views of the facts were incorrect. In our determinations, we have taken the foregoing into account and have resolved many otherwise uncertain matters in favor of respondent's view of the facts.

Petitioner's counsel is put on notice that (1) the Rule is designed both to facilitate the work of the Court and also to provide a "level playing field" to the parties, and (2) the Court will be inclined to impose formal sanctions in the event of future similar violations.

Sec. 7491, which shifts the burden of proof to the Commissioner if the taxpayer meets certain conditions, is effective for court proceedings arising in connection with examinations beginning after July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(a), 112 Stat. 726. Respondent began examining petitioner's 1995 and 1996 Federal corporate income tax returns sometime in early 1997. Accordingly, sec. 7491 does not apply in the instant case.

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner is engaged in the business of retail selling of manufactured homes, also known as mobile homes, trailers, or trailer homes, hereinafter sometimes collectively referred to as mobile homes. At all relevant times, Jack and Mary each owned 50 percent of petitioner's stock. Petitioner's stock was not publicly traded.

## A. Jack's Background

Jack served in the U.S. Marine Corps for 3 years. In 1954, he left the Marine Corps and moved to Dallas, Texas, where he began a career in the automobile business. Jack served as the sales, finance, and insurance manager for several General Motors dealerships. In 1973, he left the automobile business to pursue a career in the mobile home business.

## B. Petitioner's Origin and Economic Development

Jack began his mobile home retailing business with capital raised from the $8,000 of equity that he had in his home and a $50,000 bank loan. He used this capital to establish an inventory of about six mobile homes. Jack increased his inventory by buying distressed merchandise at a discount--new mobile homes that lenders had repurchased from retailers who were going out of business. He attributed the failures of other retailers' businesses to an economic downturn that began in 1973.

Jack did not employ anyone in his mobile home retailing business during its first year.

During the 1980s, the mobile home retailing business in petitioner's region of the country (Texas, Louisiana, and Oklahoma) endured another economic downturn, because of the oil industry. More than 45,000 mobile homes were repossessed in Texas alone. In petitioner's basic trade area, 21 mobile home retailers either went out of business or filed for bankruptcy. Petitioner was one of only two mobile home retailers located within 1 mile of petitioner that survived the 1980s' economic downturn.

During 1992 and 1993, the mobile home retailing business in petitioner's basic trade area endured another economic downturn. Although petitioner survived this downturn, many other mobile home retailers did not. Nine of the mobile home retailers that did not survive this downturn were located within 1 mile of petitioner on the US 80 corridor. Petitioner again took advantage of the situation by buying at distress sale prices mobile homes that lenders had repossessed and selling these mobile homes at regular retail prices.

Petitioner had about 16 employees during the early 1990s. In 1996, petitioner had 22 employees, 7 of whom were in sales.

Petitioner's business was operated as a sole proprietorship from 1973 until petitioner's incorporation, in 1977. Petitioner elected S corporation status as of January 1, 1987. Petitioner was a C corporation for 1988. Petitioner elected S corporation

status as of January 1, 1989, and remained in that status through 1993.  Petitioner was a C corporation for 1994 through 1996.

Petitioner reported gross sales, total income, and taxable income for 1986 through 1996 as shown in table 1.

Table 1

| Year | Gross Sales | Total Income[1] | Taxable Income(Loss) |
|------|-------------|-----------------|----------------------|
| 1986 | $2,528,724 | $530,635 | $36,429 |
| 1987 | 3,022,585 | 657,051 | 19,819 |
| 1988 | 3,569,197 | 843,645 | 15,816 |
| 1989 | 3,380,615 | 771,252 | (18,214) |
| 1990 | 3,526,171 | 884,275 | (1,791) |
| 1991 | 2,888,775 | 716,812 | (6,976) |
| 1992 | 2,732,920 | 728,845 | 118,987 |
| 1993 | 4,197,494 | 1,015,976 | 337,405 |
| 1994 | 6,559,036 | 1,383,467 | 97,840 |
| 1995 | 9,006,092 | 2,029,979 | 167,758 |
| 1996 | 9,920,208 | 2,326,709 | 151,566 |

[1] Total income includes gross profit, interest income, and other income.

Jack and Mary personally guaranteed all loans by banks to petitioner.

C.  Jack's Duties

Jack exercised complete control over petitioner's business since it was founded (1973) and over petitioner since it was incorporated (1977), including the years in issue.  He served as petitioner's president, chief financial officer, chief executive officer, general manager, sales manager, loan officer, credit manager, purchasing officer, personnel manager, advertising manager, insurance agent, real estate manager, and corporate legal affairs liaison.  With the exception of sales manager--Jack

promoted a sales administrator to sales manager in mid-1996--Jack has always held these positions.

In his capacity as general sales manager, Jack oversaw petitioner's daily sales operations, worked with salespeople on all transactions, appraised trade-ins, negotiated with buyers, and approved all closings. In his capacity as advertising manager, Jack directed petitioner's advertising efforts: He met with all media, wrote ad copies for television, radio, and newspaper advertisements, prepared the advertising budgets, and approved all advertising costs. In his capacity as loan officer, Jack approved the underwriting for all in-house loans and personally worked delinquent accounts. In his capacity as licensed general insurance agent, Jack was responsible for petitioner's book of insurance; petitioner had more than 400 insurance customers. Petitioner insured 60 percent of its sales. The commissions earned for Jack's work as the licensed general insurance agent went to petitioner and were reported on petitioner's tax return. As the personnel manager, Jack was responsible for hiring, firing, supervising, training, and evaluating all of petitioner's employees. In his capacity as purchasing officer, Jack ordered all of petitioner's inventory, lot supplies, and office supplies. He also bought all company vehicles and approved all invoices for payment. In his capacity

as corporate legal affairs liaison, Jack reviewed legal contracts between petitioner and third parties.

In addition to the foregoing, Jack supervised the in-house bookkeeper; reviewed vendor invoices; maintained inventory records; gathered the necessary information to prepare petitioner's financial statements and tax returns; planned and monitored petitioner's cashflow; signed checks; negotiated lines of credit, advances, and loans; and directed the investment of petitioner's cash reserve. Jack extensively reviewed petitioner's quarterly financial reports.

Jack brought enthusiasm, dedication, and energy to petitioner. He made a point of being willing to meet every customer at some point in the sales process. He worked 6 to 7 days per week, and often worked long into the night. He opened and closed the business each day. If there were delinquent accounts, then Jack went out at night and collected on them. In petitioner's early years, Jack worked about 70 hours per week; during the years in issue, Jack worked about 60 hours per week. His duties also involved frequent travel.

At all times relevant to the instant case, Mary has been either petitioner's vice president, secretary, or secretary-treasurer.

D. Compensation Practices

    1. General

Petitioner did not maintain a written salary policy or bonus plan for its employees. To attract "top-notch" people it paid compensation that was equivalent to or greater than the compensation paid by other mobile home retailers. Since its incorporation, petitioner has paid all the cost of health insurance for all its employees. It has also provided paid sick and vacation leave for all its employees, except Jack (and, presumably, Mary). Although petitioner established a profit-sharing plan with Commercial National Bank in January of 1985, the plan was terminated in late 1987. In addition, petitioner's resolution on February 5, 1996, to adopt a 401(k) retirement plan was aborted on February 7, 1997, because of excessive administrative costs.

Table 2 sets forth the compensation petitioner paid to its key employees, other than Jack, for 1994, 1995, and 1996.

- 10 -

Table 2

| Name | Position | 1994 | 1995 | 1996 |
|------|----------|------|------|------|
| John Atkinson | Sales Person | $60,053 | $75,407 | $72,209 |
| Garry Hood | Sales Person | NA | 21,777 | 74,551 |
| Kurt Ley | Sales Manager | NA | 21,000 | 71,424 |
| Patsy K. Watson | Bus. Manager | 31,428 | 37,946 | 40,250 |
| Larry Gill | Service Manager | 51,161 | 56,827 | 62,523 |
| Dale Hughes | Sales Person | 26,823 | 45,210 | 27,635 |
| Tony Lewis | Sales Person | 42,763 | 55,434 | 41,445 |
| Mary Brewer | Bookkeeper/Decorator | 21,765 | 21,744 | 18,000 |

2. Jack's Compensation

During the years in issue, petitioner never had a compensation, defined benefit, or profit-sharing plan for Jack. Jack analogized petitioner's compensation policy for him to that of a farmer's: If petitioner had a good year, then Jack had a good year; if petitioner had a bad year, then Jack took "minimum wages."

Table 3 shows, for each of the years 1986 through 1996, (1) petitioner's claimed compensation payment to Jack, (2) that claimed compensation as a percentage of gross sales (supra table 1), and (3) that claimed compensation as a percentage of taxable income before deduction of that claimed compensation, supra table 1 as adjusted by adding back the claimed compensation to Jack.

Table 3

| Year | Claimed compensation | Claimed compensation as % of gross sales | Claimed compensation as % of taxable income before deduction of Jack's compensation |
|------|------|------|------|
| 1986 | $24,195 | 1.0 | 39.9 |
| 1987 | 79,413 | 2.6 | 80.0 |
| 1988 | 164,292 | 4.6 | 91.2 |
| 1989 | 84,581 | 2.5 | 127.5 |
| 1990 | 175,164 | 5.0 | 101.0 |
| 1991 | 129,828 | 4.5 | 105.7 |
| 1992 | 25,174 | 0.9 | 17.5 |
| 1993 | 25,818 | 0.6 | 7.1 |
| 1994 | 398,638 | 6.1 | 80.3 |
| 1995 | 762,186 | 8.5 | 82.0 |
| 1996 | 863,559 | 8.7 | 85.1 |

In 1995, petitioner paid $62,186 in salary to Jack over the course of the year. On December 31, 1995, petitioner paid an additional $700,000 to him as a bonus. In 1996, petitioner paid $63,559 in salary to Jack over the course of the year. On December 31, 1996, petitioner paid an additional $800,000 to him as a bonus. Jack determined the amount of his bonus each year after he and J. Michael Sledge (hereinafter sometimes referred to as Sledge) examined petitioner's financial situation. Sledge, a certified public accountant, has been petitioner's accountant since its incorporation and Jack's accountant since 1975. Sledge prepared petitioner's tax returns for both of the years in issue, and signed those tax returns as paid preparer. He represented petitioner and Jack during the audit stage that led to the instant case. He met with Jack at least quarterly every year to review the financial performance of the company and another 20-30

times a year on an ad hoc basis. He has attended most of the meetings of petitioner's board of directors since 1977.

In determining the amount of a bonus for Jack, Jack and Sledge considered petitioner's profit situation and the amount of retained earnings necessary to satisfy an investor in petitioner. Jack discussed with Sledge the possibility that the amounts of the 1995 and 1996 bonuses might be viewed as "unreasonable compensation in eyes of the Commissioner" of Internal Revenue. Jack was aware that there were risks involved with petitioner's payment of the bonuses on the last day of the year.

Petitioner's corporate board minutes for 1995 and 1996 do not reflect any intent to increase Jack's compensation in those years to make up for Jack's earlier years' undercompensated services.

E.  Distribution and Dividend History

Petitioner distributed $116,100 in 1993, as an S corporation. Petitioner distributed $320,949 dividends in 1994, as a C corporation. This was done in accordance with Sledge's recommendation. The 1993 and 1994 distributions are the only ones petitioner ever made, through the end of 1996. Petitioner did not have any agreements with any banks or financial institutions with which it dealt that prohibited it from declaring dividends for the years in issue.

F.  Business Practices

  1.  Products

    Over the years, petitioner has been a dealer of about 20 different brands of mobile homes.  In 1995 and 1996, petitioner carried the Fleetwood line of mobile homes as its primary product offering.  Fleetwood manufactures price-competitive, high quality mobile homes.  Fleetwood dealerships generally are very successful.

    During the years in issue, petitioner did not have a franchise agreement with Fleetwood, nor did petitioner receive any market protection from it.  Indeed, there was another Fleetwood retailer located "almost next door" to petitioner.

    For 1995-1996, petitioner was ranked number 36 of Fleetwood retailers in the nation.  For 1996-1997, petitioner was ranked (1) the top Fleetwood retailer in Louisiana, and (2) number 13 in the nation.

  2.  Financing

    Since 1991, petitioner has offered financing to customers who Jack describes as "people that do not conform to the average lending institution."  Jack managed this loan portfolio for petitioner and also served as the underwriter for each of the loans.  Petitioner has extended more than 200 loans as part of its financing endeavors.  Of this number, only three failed, and only one resulted in a loss to petitioner.  Petitioner's mobile

home loan portfolio produced $87,974 interest for 1995 and $89,357 interest for 1996.

### 3. Insurance Underwriting

Before petitioner could install a mobile home on a buyer's location, the buyer had to insure the mobile home. As a licensed fire and casualty insurance agent, Jack wrote insurance policies for 60 percent of petitioner's sales. These policies were then attached to their corresponding notes, which were sold to banks. The commissions earned from the insurance sales went to petitioner. Petitioner reported "Part. & Insurance Income" of $58,019 and $44,566, respectively, on its 1995 and 1996 tax returns.

## G. Conclusions

Table 4 sets forth the parties' and the Court's positions with respect to claimed compensation payments by petitioner to Jack for the years in issue. Petitioner contends that all of the amounts paid meet the requirements for deductibility, and that greater payments, unspecified in amount, also would be deductible. Respondent's determinations and contentions, and the Court's redeterminations, are in terms of the maximum amounts that meet the requirements for deductibility.

Table 4

|  | 1995 | 1996 |
|---|---|---|
| Petitioner: Paid, deducted, and stands by tax returns | $762,186 | $863,559 |
| Respondent Allows: | | |
| Notice of deficiency | [1] 423,245 | [2]465,800 |
| After concessions | [3] 604,117 | 485,966 |
| Court Finds: | 610,000 | 630,000 |

[1] In the notice of deficiency, respondent allowed a deduction of $444,989 of the amount petitioner paid to both Jack and Mary. Because respondent concedes that the entire $21,744 paid to Mary is deductible, this leaves $423,245 as the amount petitioner paid to Jack that respondent determined to be deductible.

[2] In the notice of deficiency, respondent allowed a deduction of $483,800 of the amount petitioner paid to both Jack and Mary. Because respondent concedes that the entire $18,000 paid to Mary is deductible, this leaves $465,800 as the amount petitioner paid to Jack that respondent determined to be deductible.

[3] This is the sum of $599,117, derived by Hakala's formulaic approach, plus "additional compensation of $5,000.00 to Mr. Brewer for providing his personal guarantee to secure a short-term working capital line of credit in 1995." Infra OPINION, C. Analysis, 1. Reasonableness, (d) Amount of Reasonable Compensation, (2) Loan Guarantee.

Petitioner did not intend in 1995 and did not intend in 1996 to compensate Jack for his earlier services to petitioner.

OPINION

A. Parties' Positions

Petitioner maintains that the amounts it paid to Jack as compensation were reasonable in amount, within the meaning of section 162(a)(1), and so these amounts are fully deductible.

Respondent "agrees that Mr. Brewer brought enthusiasm, dedication[,] and energy to the Petitioner, and that the company experienced great growth during the mid 1990s; however," respondent contends that any amounts paid to Jack in excess of $604,117 for 1995 and $485,966 for 1996 were not intended as payments purely for personal services,[4] and even if they were so

---

[4] On answering brief, petitioner contends as follows:

> The Respondent contends that a portion of the payments are disguised dividends. * * *

> The issue as to whether the payment of compensation was purely for services is not before the Court.

> The Notice of Deficiency did not raise the issue of disguised dividends or the compensatory nature of the services, or assert that any portion of the payment was a disguised dividend. * * * It is unfair to the Petitioner after close of the trial to raise a new issue that being that the payment received by Mr. Brewer was for something other than the services he rendered. * * *

> The Petitioner contends that only the amount of compensation the Court may find is in excess of a reasonable amount, if any, be declared to be a dividend, and that the Respondent not be allowed to dispute the compensatory nature of the payments to Mr. Brewer.

For the following reasons, we conclude that the issue of whether any part of petitioner's payments to Jack was disguised dividends, rather than intended compensation for personal services, is properly before the Court.

Firstly, the notice of deficiency explanation includes the alternative that disallowed amounts were not "expended for the purposes designated."

Secondly, the first sentence of respondent's opening statement before the trial is as follows:

(continued...)

intended, they were unreasonable in amount for the services he rendered. Respondent argues that these excess amounts are not deductible under section 162(a)(1).

B. Summary; Conclusions

In determining the maximum reasonable compensation for Jack's services for the years in issue, we have considered the relevant factors listed in Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267. Both parties presented expert witness reports and testimony on the applicability of the relevant factors to the instant case. While we do not find the experts' conclusions

---

⁴(...continued)
    OPENING STATEMENT BY COUNSEL ON BEHALF OF THE
RESPONDENT

    MS. CALKINS: Your Honor, this case presents two
questions: whether a portion of payments made to Mr. Brewer
in 1995 and 1996 and deducted as officer's compensation by
the Petitioner are actually disguised dividends. * * *

The second question, respondent stated, was whether the deducted
amounts "are reasonable in amount." The final sentence of
respondent's opening statement is as follows:

    It is Respondent's position that in spite of Mr.
Brewer's contributions to Petitioner during the years at
issue, the payments to him over and above what Respondent
has allowed in the trial memorandum should be disallowed as
disguised dividends.

Thirdly, our search of the transcript shows that,
notwithstanding respondent's clear statements at the start of the
trial, petitioner did not object, or otherwise comment on this
matter, at that time or at any other time during the 3-day trial.

particularly helpful, we do use some of the data and analyses they provide in reaching our decision.

We first consider the Robert Morris Associates (hereinafter sometimes referred to as RMA) report for the industry on financial ratios, which provides data on, among other things, executive compensation as a percentage of sales for companies comparable to petitioner. Based on petitioner's and the mobile home retail industry's financial performances in 1995 and 1996, we conclude that Jack's compensation as a percentage of sales should be compared to those of executives in comparable companies at around the 90th percentile. By multiplying petitioner's sales by the appropriate RMA factor for each year, we determine that payments to Jack, as compensation for the services he performed for petitioner, would have been about $520,000 in 1995 and $600,000 in 1996. We add $5,000 to the 1995 amount on account of Jack's guaranty of a bank loan to petitioner.

We also consider the fact that petitioner did not provide Jack with retirement benefits. Based on comments by respondent's expert, we conclude that an amount of about 5 percent of Jack's compensation would be sufficient to compensate him for the absence of retirement benefits. This brings reasonable compensation to about $550,000 in 1995 and $630,000 in 1996.

In light of respondent's willingness to allow what Hakala recommends for 1995, plus correction of Hakala's mathematical errors, we round the 1995 amount to $610,000.

We conclude that all of the amounts that would have been reasonable compensation to Jack were intended by petitioner to be compensation and not dividends.

C. <u>Analysis</u>

Section 162(a)(1)[5] allows a deduction for the payment of compensation, but only if the compensation is both (1) reasonable in amount and (2) paid for personal services rendered. <u>Paula Construction Co. v. Commissioner</u>, 58 T.C. 1055, 1058 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); sec. 1.162-7(a), Income Tax Regs. The question of reasonableness is one of fact which must be resolved on the basis of all the facts and circumstances in the case. <u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d at 1323; <u>Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner</u>, 528 F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564, 567 (1974); <u>Estate of Wallace v. Commissioner</u>,

---

[5] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered * * *

95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992); Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155 (1980).

In addition to multifactor tests (see Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1323), courts have also used independent investor tests to determine whether payments to an employee-shareholder exceeded reasonable compensation. See, e.g., Dexsil Corp. v. Commissioner, 147 F.3d 96, 100-101 (2d Cir. 1998), vacating and remanding T.C. Memo. 1995-135, on remand T.C. Memo. 1999-155. Generally, courts have described independent investor tests as a lens through which the entire analysis should be viewed. Dexsil Corp. v. Commissioner, id. at 101. In Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1327, the Court of Appeals for the Fifth Circuit stated: "The so-called independent investor test is simply one of the factors a court should consider, and in certain cases it may be a substantial factor." In discussing the significance of a corporation's dividend practices, that Court also stated: "The prime indicator of the return a corporation is earning for its investors is its return on equity." Id. at 1326-1327.

Discerning the intent behind the payments also presents a factual question to be resolved within the bounds of the individual case. Nor-Cal Adjusters v. Commissioner, 503 F.2d

359, 362 (9th Cir. 1974), affg. T.C. Memo. 1971-200; Paula Construction Co. v. Commissioner, 58 T.C. at 1059.

Where officer-shareholders who are in control of a corporation set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits. Rutter v. Commissioner, 853 F.2d 1267, 1270-1271 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1324; Estate of Wallace v. Commissioner, 95 T.C. at 556; sec. 1.162-7(b)(1), Income Tax Regs.

We will consider first whether (and, if so, then to what extent) the payments to Jack exceeded reasonable compensation, and then whether (and, if so, then to what extent) any part of the payments that survive the first test should nevertheless be nondeductible because they were not intended to be compensation. Compare Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325 (payments made in the form of compensation), with Paula Construction Co. v. Commissioner, 58 T.C. at 1057, 1059-1060 (payments made in the form of distributions), and King's Court Mobile Home Park v. Commissioner, 98 T.C. 511, 514-515 (1992) (corporation's unreported income diverted to shareholder).

1. Reasonableness

Many factors are relevant in determining whether amounts paid to a person were reasonable compensation, including the

following:  The person's qualifications; the nature, extent, and scope of the person's work; the size and complexities of the business; a comparison of salaries paid with gross income and net income; the prevailing general economic conditions; a comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all persons; in the case of small corporations with a limited number of officers the amount of compensation paid to the particular person in previous years; and whether the corporation provided the person with a pension or profit-sharing plan.  <u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d at 1323, and cases there cited.  No single factor is decisive; rather, we must consider and weigh the totality of the facts and circumstances in arriving at our decision.  <u>Idem.</u>

Before we apply the relevant factors to the instant case, we note that petitioner presented evidence of three offers to buy petitioner.  The parties devoted substantial efforts to analyze the direct and indirect (i.e., regarding return on investment) significance of these offers.  Indeed, respondent's expert opined: "The single best evidence of reasonable compensation can be found in the three subsequent offers to acquire the assets and business of [petitioner]".  However, none of the offers is sufficiently detailed to enable us to determine what Jack's

services would be worth under that offer. (Petitioner contends that one offer would justify a 1996 compensation level higher than petitioner paid, while respondent contends that, using the same methodology that petitioner used, one of the other offers, would lead to a conclusion that the maximum 1996 reasonable compensation would be only $79,103.) Also, the parties do not assist us in deciding how to adjust for the difference in time between the offers' presentations and the years in issue. Finally, we do not even know when one of the offers was made. Under these circumstances, we conclude that the offers are not to be given any weight in determining the amounts of reasonable compensation for Jack's services for the years in issue.

The following indicia of relatively high reasonable compensation are present in the instant case:

(1) Jack has been involved in every aspect of petitioner since its inception. Through his enthusiasm, hard work, and dedication, he built petitioner into a successful enterprise. He served as its president, chairman, chief executive officer, general manager, chief financial officer, credit manager, purchasing officer, personnel manager, advertising manager, insurance agent, real estate manager, and corporate legal affairs liaison. He worked 60 hours per week, 6 to 7 days per week.

(2) Petitioner grew rapidly between 1991 and 1996. In 1995, it was ranked number 36 of Fleetwood mobile home retailers in the nation; in 1996, it climbed to number 13 in the nation.

(3) Jack personally guaranteed the working capital lines of credit of petitioner.

(4) Petitioner did not provide a defined benefit or profit-sharing plan to Jack. The only nonsalary benefit that petitioner provided to Jack was health insurance; Jack (and, presumably, Mary) was the only employee who did not receive paid sick and vacation leave.

(5) Under Jack's control, petitioner survived several economic downturns when many other mobile home retailers went out of business.

The following indicia of relatively low reasonable compensation are present in the instant case:

(1) The claimed compensation petitioner paid to Jack in 1995 and 1996 constituted 8.5 percent and 8.7 percent, respectively, of petitioner's gross sales, and 82 percent and 85 percent, respectively, of petitioner's taxable income. These percentages exceed those of most similar companies.

(2) Petitioner did not maintain a compensation policy for Jack. Because Jack controlled the corporation, he was able to set his own compensation.

(3) The bonus amounts were not set in accordance with any formula or other detailed arrangement agreed upon in advance. Rather, they were determined and paid at the end of the year, when petitioner knew its profitability for that year.  Thus, Jack's compensation was set on an ad hoc basis.

(4) Petitioner did not pay dividends in 1995 or 1996, even though it had made a distribution in 1993 and paid dividends in 1994, and profitability before officer's compensation was greater in 1995 and 1996 than it was in the two earlier years.

(5) Petitioner's average return on equity, which measures the percent of profit before taxes as a percentage of tangible net worth, was below that of comparable companies for the years in issue.

At trial, both parties presented the reports and testimony of expert witnesses.  Petitioner's experts were Sledge and Mae Lon Ding, hereinafter sometimes referred to as Ding. Respondent's expert was Scott D. Hakala, hereinafter sometimes referred to as Hakala.

Before admitting expert testimony into evidence, the trial judge is charged with the gatekeeping obligation of ensuring that the testimony is both relevant and reliable.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993); Caracci v. Commissioner, 118 T.C. 379, 393 (2002), on appeal (5th Cir. Oct.

15, 2002).  This gatekeeping obligation applies to all expert testimony, including testimony based on technical and other specialized knowledge.  Kumho Tire Co. v. Carmichael, 526 U.S. at 141; see Fed. R. Evid. 702.

As trier of fact, we are not bound by the opinion of any expert witness and will accept or reject expert testimony, in whole or in part, in the exercise of sound judgment.  Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991) (and cases there cited), affg. T.C. Memo. 1990-87.

The three experts agree on some aspects of elements that should be taken into account in determining what would be reasonable compensation for Jack's services to petitioner, but even there they do not agree on what numbers those aspects should lead us to.  Each expert does a much better job of explaining why the other side is wrong than why his or her analysis is correct.  To that extent, each expert has been helpful.  To put it another way, the experts have provided substantial assistance to the trier of fact (Fed. R. Evid. 702) in identifying and winnowing out the chaff; they have provided far less assistance in identifying and keeping the wheat.  See United States v. Mastropieri, 685 F.2d 776, 786 (2d Cir. 1982).

(a)  Hakala

Hakala is a principal in Business Valuation Services, Inc. He had academic training in compensation theory and was awarded

the degree of Ph.D. in Economics by the University of Minnesota. He has testified as an expert witness in reasonable compensation cases.

Table 5 shows the amounts that Hakala concluded were maximum reasonable compensation for Jack's services to petitioner in 1994, 1995, and 1996, per Hakala's expert witness report (Ex. 60-R) and Hakala's rebuttal expert witness report (Ex. 61-R).

Table 5

|      | Ex. 60-R  | Ex. 61-R  |
|------|-----------|-----------|
| 1994 | $381,608  | $410,626  |
| 1995 | 544,419   | 599,117   |
| 1996 | 448,620   | 485,966   |

The task of calculating a maximum amount of reasonable compensation ordinarily, and in the instant case, involves judgment calls, generalizations, and very rough approximations. We are mindful of Judge Tannenwald's observation that in valuation disputes (and reasonable compensation disputes are essentially a subset of valuation disputes) there is often "an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise". Messing v. Commissioner, 48 T.C. 502, 512 (1967); see Estate of Jung v. Commissioner, 101 T.C. 412, 446 (1993).

Hakala acknowledges that the correction of but one set of inconsistencies in his expert witness report assumptions results

in changes of 7 to 10 percent in his conclusions.  Ex. 61-R, pp.6-7, IV-3.  We are struck by the fact that Hakala has so much confidence in the combination of accuracy and precision of his numbers and analysis that, even after the humbling exercise of making the gross corrections he describes, he claims to be able to come to conclusions to six significant figures.  Supra table 5.  Respondent urges us to follow in Hakala's footsteps--to six significant figures.  We respond that, neither Hakala's nor respondent's continued presentation of six-significant-figure conclusions causes us to have any confidence that the precision of those conclusions is an indication that those conclusions are accurate.[6]  Indeed, Hakala's efforts to persuade us to walk that road serve only to cause us to doubt his judgment.  When we doubt the judgment of an expert witness on one point, we become reluctant to accept that expert's conclusions on other points.[7]

---

[6]  A quotation from Shakespeare is perhaps apt:

Glendower:  I can call spirits from the vasty deep.

Hotspur:  Why, so can I, or so can any man;  But will they come when you do call for them?

Henry IV, Part I, act 3, sc. 1.

[7]  For completeness, it should be noted that, when the Court asked Hakala "why it is that you believe it is appropriate to come up with a result to six significant figures", he responded that--

no one in a real compensation would round to six significant figures, that normally I would round to the nearest thousand
(continued...)

When the Court asked Hakala if he was "confident" in his conclusion that reasonable compensation for 1996 should be substantially below reasonable compensation for 1995 (see supra tables 4 and 5), he responded as follows:

> THE WITNESS: No, and I think they have a valid point that there was more income, and what I missed was that in the other income was the rebate from Fleetwood. When you factor the rebate from Fleetwood in, the compensation for '96 should go up. If you do that, then you have to adjust the compensation for '95 downward. So, you know, I would agree that I think intuitively, '96 should probably be higher than '95.

Notwithstanding this testimony, Hakala did not change his report recommendations, and respondent's posttrial briefs still urge us to adopt Hakala's report recommendations, with substantially lower reasonable compensation for 1996 as compared to 1995.[8]

---

[7](...continued) or the nearest 5,000. In effect, if I was at 599, I'd round up to 600,000. If it was at 485, I might round to 485.

However, notwithstanding Hakala's concession that "no one" in a real situation would determine reasonable compensation to six significant figures, Hakala did not change his report recommendation, and respondent's posttrial briefs still urge us to adopt Hakala's six-significant-figure recommendations.

[8] At trial, Hakala explained that, if he adjusted upward the maximum reasonable compensation for Jack for 1996, then he would have to make a corresponding downward adjustment for 1995. Neither Hakala at trial nor respondent on brief has explained why an upward adjustment for 1996 on account of the Fleetwood rebate would require a downward adjustment for 1995, except that at trial Hakala invoked the imagery of "squeezing on a balloon."

(b) <u>Sledge</u>

Sledge is a C.P.A. in private practice in his own firm. He was awarded the degree of B.S. in Industrial Psychology by Louisiana State University and took postgraduate work to prepare himself for the C.P.A. examination. He has testified as an expert witness in business valuation cases, and other matters involving officer compensation issues.

Sledge did not determine what was maximum reasonable compensation for Jack's services to petitioner in the years in issue, but concluded that "it is my opinion that the salary paid to Mr. Brewer during 1995 and 1996 is reasonable." As a result, we can agree with much of what Sledge says, and still have little or no guidance from his expert witness report as to what numbers to set for reasonable compensation.

Before the trial, respondent moved in limine to exclude Sledge's expert witness report and to not allow Sledge to testify as an expert witness. Respondent pointed to Sledge's obvious conflict of interest and contended that Sledge "is unable to provide the degree of objectivity required of an expert witness." We concluded that, in the instant case, it was better to (1) take Sledge's conflict of interest into account in weighing his expert witness report and expert testimony, and (2) not exclude Sledge and his report. In retrospect, we conclude that we made the right decision on this matter; i.e., we conclude that Sledge's

expert witness report, his rebuttal report, and his expert witness testimony did assist us, as trier of fact, in understanding concepts involved in determining reasonable compensation, and in understanding matters raised by Hakala. See Koch Refining Co. v. Jennifer L. Boudreau MV, 85 F.3d 1178, 1182-1183 (5th Cir. 1996).

(c) Ding

Ding is president of Personnel Systems Associates. She was awarded the degree of M.B.A. by the University of Southern California, and the degree of B.A. in Industrial Psychology from UCLA. She has testified as an expert witness in reasonable compensation cases.

Ding did not conclude what was maximum reasonable compensation for Jack's services to petitioner in the years in issue, but she concluded that "Mr. Brewer was compensated at a rate in 1995 and 1996, which we believe an investor in an arm's-length transaction would have thought to be reasonable". Nevertheless, Ding's presentation of the data from RMA enables us to make our own evaluation and to start the process of redetermining reasonable compensation numbers for Jack's services.

(d) <u>Amount of Maximum Reasonable Compensation</u>

(1) <u>RMA Ratios</u>

Both Hakala and Ding direct our attention to RMA surveys of companies that specialize in mobile home retailing. None of the expert witnesses was able to identify any published surveys of the <u>amounts</u> of executive compensation for the mobile home retailing industry. However, it was noted that the RMA's surveys provided financial ratios, including a ratio for executive compensation to company sales.

In her analysis of the RMA data, Ding stated that petitioner's--

> average compensation [total executive compensation, including what petitioner paid to Mary] to sales ratio for the period 1986-1996 was 4.6%, which was slightly above the RMA 75th percentile of 4.2% and considerably below our [i.e., Ding's] projection of the 90th percentile average of 5.9% (Exhibit F).

Ding regarded the following considerations as being among those leading to her conclusion that Jack "achieved exceptional financial performance" at petitioner, "justifying a comparison of compensation above the 75th percentile and as high as the 90th percentile":

> Petitioner's sales grew at an average annual rate of 17 percent while the industry grew at an average annual rate of only 10.8 percent.

> Petitioner's inventory turnover rate, "a key measure of efficient use of capital and inventory management", was more than one-third higher than the mobile home retail industry as a whole.

Petitioner "has very high capitalization relative to industry norms which reduce risk to the shareholder in the event of a downturn in business, saves interest costs on loans, enables faster growth, and causes ROE [returns on equity] ratios to understate true profit performance."

From the foregoing and other matters, Ding concluded as follows:

When all the above factors are taken into consideration, it is apparent that Brewer Quality Homes' performance is among the best in the industry. CEOs who achieve top performance in their industry receive top pay, therefore it is reasonable to expect that Jack Brewer would receive compensation above the 75th percentile and as high as the 90th percentile.

Hakala, on the other hand, stated that for 1995 and 1996 Jack's "compensation level * * * [as a percentage of sales] was significantly higher than the third quartile levels of the RMA comparable firms." He stated that this high compensation level resulted in a drop in profitability which, together with an elimination of dividends, provided "low returns to its [petitioner's] shareholder."

In his rebuttal report, Hakala presented several criticisms of Ding's use of RMA data. We consider these criticisms seriatim.

Ding used average percentages over time, while Hakala focused on year-by-year figures for 1994 through 1996. Table 6 compares petitioner's total officer compensation (Jack's plus Mary's, in the case of petitioner) as a percentage of mobile home

sales, on the one hand, to Ding's and Hakala's different approaches as to the RMA 75th percentile data.

Table 6

|  | Petitioner | RMA--Ding | RMA--Hakala |
|---|---|---|---|
| 1994 | 6.4 | 4.2 | 5.4 |
| 1995 | 8.7 | 4.2 | 5.4 |
| 1996 | 8.9 | 4.4 | 3.4 |
| Averages |  |  |  |
| Ding (1986-1996) | 4.6 | 4.2 | -- |
| Ding (1994-1996) | 8.0 | 4.3 | -- |
| Hakala (1994-1996) | 8.0 | -- | 4.7 |

Ding's focus on 11-year averages led her to conclude that petitioner's 11-year average payment ratios are only a little higher than the RMA 75th percentile ratios (4.6 percent to 4.2 percent) and much lower than the estimated RMA 90th percentile ratios[9] (4.6 percent to 5.9 percent). Hakala, on the other hand, concluded that petitioner's 1-year payment ratios are much higher than the RMA 75th percentile ratios (8.0 percent to 4.7 percent). Supra table 6.

Hakala also criticized Ding's analysis, as follows:

In the tax year 1986 through 1993, BQH [petitioner] elected S Corporation status. The owner-officer of an S Corporation has an incentive to minimize personal salary and bonus compensation and to recognize greater taxable corporate

---

[9] Hakala ignores Ding's estimates of RMA 90th percentile ratios; he neither disputes nor accepts the correctness of Ding's estimates. However, on brief, respondent accepts the correctness of Ding's estimates of RMA 90th percentile ratios, at least for the purpose of pointing out that petitioner's 1995 and 1996 ratios are far higher than the ratios that Ding applies.

income due to payroll taxes on reported compensation.[10]
This calls into question the appropriateness of an
undercompensation analysis in the years 1986 through 1993.

Firstly, for 2 of the 8 years Hakala refers to (1986 and 1988), petitioner was a C corporation, not an S corporation. It is not clear whether these mistakes were merely "harmless error" or whether this affected Hakala's conclusions.

Secondly, if Hakala's thesis is correct, that this "incentive" affected petitioner's actions during the C corporation years, then it becomes relevant to determine whether (and to what extent) it also affected the similar-sized businesses that provided the underlying data for the RMA ratios.

---

[10] In general, an S corporation shareholder is taxed on the shareholder's pro rata share of the corporation's income, regardless of whether the shareholder actually receives a distribution. Sec. 1366(a)(1). Where the shareholder is also an employee of the corporation, there is an incentive both for the corporation and for the employee-shareholder to characterize a payment to the employee-shareholder as a distribution rather than as compensation because only payments for compensation are subject to Federal employment taxes. See secs. 3111, 3301. In such instances, the Commissioner may recharacterize a distribution as compensation in order to reflect the true nature of the payment. See Rev. Rul. 74-44, 1974-1 C.B. 287 ("dividends" paid to S corporation shareholders treated as reasonable compensation for services rendered and subjected to Federal employment taxes); see also Veterinary Surgical Consultants, P.C. v. Commissioner, 117 T.C. 141, 145-146 (2001), affd. sub nom. Yeagle Drywall Co. v. Commissioner, 54 Fed. Appx. 100 (3d Cir. 2002).

Although Hakala argued that petitioner may have practiced tax gamesmanship in one or more of the years before 1995, the record does not disclose that respondent made a determination on this matter, nor can we tell from the record whether petitioner did distort the situation.

Until we know that, we do not know how to deal with the concern that Hakala has described.

Thirdly, Hakala does not: (a) Point to any evidence that would enable us to quantify the amount, if any, by which this potential gamesmanship actually diminished the compensation that petitioner paid to Jack in any year, (b) suggest any way of adjusting the ratio for petitioner to compensate for this potential gamesmanship, or (c) explain why petitioner and Jack would shift payments from compensation in 1993 but not use that device for 1989, 1990, and 1991, when presumably the same "incentives" were in play and when petitioner and Jack had the same tax adviser that they had in 1993.

Thus, Hakala's speculation is interesting but we do not find it helpful in analyzing the instant issue. See infra (3) Previous Underpayment.

Hakala also presents the following double-barreled attack on Ding's reliance on the RMA data:

> The Robert Morris Associates ("RMA") data requires more analysis than was provided by Ms. Ding. First, we don't know exactly how many officers, directors and affiliates are represented in the total officers' compensation in the RMA figures. For larger dealerships, our experience is that more than one officer is included and sometimes three or more persons may be represented in the total figures. Second, we don't know the extent to which the officers' compensation is consistent with arm's length practices. The BVS Report summarized in Exhibits II-2 and II-3 [attachments to Exh. 60-R, Hakala's expert witness report] represents an attempt to address these issues. The suggested total compensation at the 75th percentile level is at most $324,219 in 1995 and $224,858 in 1996 for a single officer

and $486,329 in 1995 and $337,287 in 1986 for two officers or more executive officers of BQH based on this information.

As to the multiple-officer concern, we are satisfied that Ding's approach is useful, in the absence of anything better. Ding determined appropriate total officer compensation, subtracted the agreed-upon compensation to Mary, and concluded that the remainder is appropriate compensation to Jack.  In the material that Hakala cites, he assumed that, in a two-officer arrangement, the second officer was compensated at half the rate of the first officer, and concluded that the CEO's compensation was 67 percent of the total officer compensation.  We agree that Hakala's conclusions follow, arithmetically, from his assumptions.  However, Hakala does not give us any reason to conclude that Hakala's "attempt to address these issues" is any better than Ding's approach.  In the absence of any hard information as to businesses of petitioner's size, other than the evidence of petitioner's own history, we are willing to follow Ding's approach.

Hakala's concern that the underlying RMA data may not be "consistent with arm's length practices" is the more serious attack.

However, Hakala does not provide anything to back up the suspicion that he voices.  Also, the material to which Hakala directs our attention does not appear to address this issue at all.  Finally, the numbers that Hakala finally commends to us

($599,117 for 1995, $485,966 for 1996, supra tables 4, 5) are substantially greater than the numbers that Hakala tells us would result from the RMA 75th percentile data that Hakala suggest are too great.

Hakala does not direct our attention to any other data that focus on the mobile homes retail sales industry.[11]

On this record, the RMA ratios leave much to be desired as a foundation for decision-making. We nevertheless use those ratios as a starting point, because they are the only statistical information we have that deals with mobile home retailers. In other words, the RMA ratios are "the only game in town". See, e.g., United States v. Borum, 584 F.2d 424, 434 (D.C. Cir. 1978) (MacKinnon, J., dissenting).

The years in issue, 1995 and 1996, were good years for the mobile home retailing industry and even better years for petitioner.[12]

---

[11] In his rebuttal report, Hakala states as follows:

The single best evidence of reasonable compensation can be found in the three subsequent offers to acquire the assets and business of BQH [petitioner] found in the exhibits to Ms. Ding's report.

However, Hakala relies on these offers only to the extent of contending that, in reality, the offers amount to less compensation for Jack than the approach that Hakala uses. In effect, then, Hakala rejects the lessons of the evidence that he describes as "The single best evidence".

[12] Petitioner's sales increased proportionately more than
(continued...)

Jack guided petitioner through the hard times when many of petitioner's competitors went out of business and into the breakout years of 1995 and 1996.[13]  We are satisfied that Jack's long-term efforts leading up to 1995 and 1996, and Jack's spectacularly successful work in 1995 and 1996, justify ranking Jack with the leaders of his field for the latter years.  To us, this means that reasonable compensation for 1995 and 1996 is to be determined by reference to the 90th percentile of officer compensation payments.

---

[12](...continued)
the industry's sales, as shown by the following table:

| Year | Petitioner's Sales see supra Table 1 | Industry Sales | Petitioner's Sales as a % of Industry Sales |
|------|--------------------------------------|----------------|---------------------------------------------|
| 1986 | $2,528,724 | $5,480,384,000 | 0.046 |
| 1987 | 3,022,585 | 5,512,572,600 | 0.055 |
| 1988 | 3,569,197 | 5,482,567,900 | 0.065 |
| 1989 | 3,380,615 | 5,392,508,800 | 0.063 |
| 1990 | 3,526,171 | 5,231,181,600 | 0.067 |
| 1991 | 2,888,775 | 4,728,750,100 | 0.061 |
| 1992 | 2,732,920 | 5,986,350,800 | 0.046 |
| 1993 | 4,197,494 | 7,755,418,000 | 0.054 |
| 1994 | 6,559,036 | 10,181,722,000 | 0.064 |
| 1995 | 9,006,092 | 12,327,516,300 | 0.073 |
| 1996 | 9,920,208 | 13,954,982,400 | 0.071 |

[13]  Hakala stated, in his rebuttal report:

BQH [petitioner] was a well run and successful dealership with an established franchise and presence.  Mr. Brewer clearly deserves substantial credit for this success in 1995 and 1996.

We note that the RMA ratios fluctuate greatly from year to year, and even the relative ratios (i.e., comparisons of the ratios for smaller companies with the ratios for larger companies) fluctuate greatly. None of the experts discusses the factors that led to the RMA ratio fluctuations. Ding attempted to "smoothen" the relevant ratios. See supra table 6 for 75th percentile numbers. For 90th percentile numbers, Ding used 6.0 for 1995 and 6.3 for 1996. Hakala did not discuss whether there should be a different approach to the smoothening process or whether the RMA ratio amounts should be used without any smoothening. In the absence of criticism by Hakala, we are willing to follow Ding's smoothening approach. We apply the RMA 90th percentile ratios to petitioner's 1995 and 1996 sales to obtain total shareholder-employee reasonable compensation. From the totals thus obtained, we subtract the amounts petitioner paid to Mary, which have been agreed to be reasonable compensation for Mary's services.

However, our willingness to follow Ding's analysis regarding Jack's 90th-percentile status, at least for 1995 and 1996, does not lead us to Ding's conclusions that all of Jack's compensation is reasonable for each of these years. As Ding acknowledged at trial, the compensation that petitioner paid to Jack for each of these years, as a percentage of petitioner's sales, was

significantly higher than the 90th-percentile level shown by the RMA data for the same years.

Our acceptance of Ding's thesis, then, leads us to apply the RMA 90th-percentile ratios to petitioner's sales, which results in reasonable compensation amounts significantly less than petitioner's actual payments to Jack.  This process leads us to initial calculations of $520,000 for 1995 and $600,000 for 1996 as reasonable compensation amounts for Jack's services.

### (2)  Loan Guaranty

Hakala opined, in his expert witness report, that Jack was entitled to an additional $5,000 reasonable compensation "for providing his personal guarantee to secure a short-term working capital line of credit in 1995".  Respondent has conceded the allowability of this additional amount.  Petitioner does not dispute this item; we accept it.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325 n.33.

Accordingly, we increase our 1995 reasonable compensation determination to $525,000.

### (3)  Previous Underpayment

Petitioner contends that Jack was underpaid in previous years, particularly 1992 and 1993.  See supra table 3. Petitioner argues as follows:

> While there are no corporate minuets [sic] declaring any part of Mr. Brewer's compensation for 1995 and 1996 as make up salary, a good faith argument for extension of existing law can be made where it is apparent from the facts

because of the extreme disparity between Mr. Brewer's compensation in 1992 and 1993 and his compensation in both previous and following years that the fact that he was being compensated for past performance is plainly apparent.

Respondent's rejoinder is twofold: (1) There is no indication of an intent to compensate Jack in 1995 or in 1996 on account of past undercompensation, and (2) Hakala concluded that Jack was adequately compensated for Jack's services to petitioner for 1986 through 1994.

Amounts paid in a later year for earlier years' services may be deducted when paid, if the services were undercompensated in the earlier years. Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); Estate of Wallace v. Commissioner, 95 T.C. at 553; Cropland Chemical Corp. v. Commissioner, 75 T.C. 288, 297-298 (1980), affd. without published opinion 665 F.2d 1050 (7th Cir. 1981); R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-51 (1972). In order to be allowed the deduction, the taxpayer must establish (1) the amount of the undercompensation for the earlier years' services and (2) that the payment in the later year is intended as compensation for the earlier years' services. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Perlmutter v. Commissioner, 373 F.2d 45, 48 (10th Cir. 1967), affg. 44 T.C. 382, 403 (1965); Estate of Wallace v. Commissioner, 95 T.C. at 553-554.

In the instant case, petitioner has presented us with little more than the claim, and general conclusory testimony, that some

amount was intended as compensation for Jack's earlier years' services. We are not told (1) how much of the 1995 payments or the 1996 payments was so intended; (2) how the intent was arrived at or formulated; or (3) what earlier years' services were being compensated for in 1995 or in 1996. For all we can tell, petitioner's "theory of compensation for prior services was only an afterthought developed at a time when the reasonableness of the compensation was already under attack." Pacific Grains, Inc. v. Commissioner, 399 F.2d at 606.

Petitioner's plea that we overlook the absence of corporate minutes runs into the concern that it is precisely in situations such as the instant case, where one person's "controlling presence was on all sides of the negotiating table" (Kean, Transferee v. Commissioner, 91 T.C. 575, 595 (1988)), that we "must carefully scrutinize the payments to ensure that they are not disguised dividends." Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1324.

On the basis of Jack's and Sledge's testimony, as well as petitioner's failure to produce any relevant corporate minutes or any other contemporaneous paper trail (see Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947)), we conclude that it is more likely than not that petitioner did not intend in 1995 and did

not intend in 1996 to compensate Jack for his earlier services to petitioner.  We have so found.

Under these circumstances we need not, and we do not, determine whether Jack was undercompensated for his earlier services to petitioner.

(4)  Nonsalary Benefits

Ding stated that petitioner's failure to provide nonsalary benefits (other than health insurance) to its executives should be taken into account in determining the maximum reasonable compensation for Jack.  She regarded as particularly important the lack of "a defined benefit plan or deferred compensation plan."  She relied on studies showing that (1) "Companies typically provide their executives with benefits representing 24.4% of compensation" and (2) "Sixty-one percent of retail and wholesale trade industries provide long-term incentive programs for their top managers".

In his rebuttal expert witness report, Hakala responded as follows:

> Compensation for Poor Benefits:  This is an interesting issue.  It is difficult to quantify.  BQH is not a large, public company.  Benefits are typically more limited for officers of manufactured home dealerships.  It is our understanding that Mr. Brewer's benefits were consistent with the benefits realized by his top sales personnel.  The data relied upon by Ms. Ding is not applicable for a company of the size and type of BQH.  However, some elements for benefits might be considered appropriate in a market compensation analysis but not in the independent investor returns analysis.

On opening brief, petitioner contends as follows:

> Additionally, Mr. Brewer's compensation lacked the typical benefits package.  Mr. Brewer's compensation package did not include, a retirement plan, a SEP, a 401(k), a Profit-sharing plan, a Defined benefits plan, a 205 plan, a 125 plan, sick leave, or paid vacation.  (Trial Trans. Vol. 1 page 38)  These types of benefits were customary in the industry and represent a substantial amount of money.  This lack of customary benefits package justifies a larger salary.  (Trial Trans. Vol. 2 pages 193-196)  Typically, companies provide their executives with benefits representing 24.4% of compensation. (Exhibit 56-P page 7 and Exhibit X therein)  If Mr. Brewer would have had a typical benefits package his cash compensation could have been 24% less and he still had the same total compensation.

On answering brief, respondent replies as follows:

> Petitioner's argument that Jack Brewer's compensation in 1995 and 1996 made up for the lack of company provided fringe benefits is unfounded.  It was not necessary for Jack Brewer to participate in a company sponsored profit sharing plan because, in fact, Jack Brewer determined and allocated substantially all company profits to himself on December 31 of each year.

We analyze this matter as follows:

Firstly, if petitioner means to say that courts apply the reasonable compensation test to only "cash compensation", then petitioner is wrong.

It has long been settled law that--

> The sum of all compensation, deferred as well as direct, must meet the requirement of §162 that it be reasonable in amount. [Edwin's, Inc. v. United States, 501 F.2d 675, 679 (7th Cir. 1974).]

To the same effect, see LaMastro v. Commissioner, 72 T.C. 377, 381-382 (1979); Bianchi v. Commissioner, 66 T.C. 324, 329-330

(1976), affd. without published opinion 553 F.2d 93 (2d Cir. 1977).

Secondly, the question of what courts do in fact requires an understanding of the effect of the limits of what is in the record before us. For example, if we knew that (1) the underlying data for the RMA ratios came from only those mobile home retailers who provided nonsalary benefits to their executives, (2) but this underlying data included only the cash compensation paid to the executives and not the value of (or current cost to buy) the nonsalary benefits, and (3) the value of (or current cost to buy) these benefits was, as Ding stated, 24.4 percent of total compensation (i.e., cash compensation plus nonsalary benefits), then we would adjust the cash compensation amount upward by about 32.3 percent to arrive at total equivalent compensation.[14] However, the record before us does not include any of the needed information as to the data underlying the RMA ratios. Also, the 24.4 percent in Ding's analysis comes from a report of a 1992 study of 297 employers. The record does not give us any characteristics of the participating employers that would enable us to make a useful judgment as to how that sample

---

[14] If nonsalary benefits are 24.4 percent of total compensation, then cash compensation constitutes the remaining 75.6 percent of the total compensation. Thus, total compensation is $\frac{100 \text{ percent}}{75.6 \text{ percent}}$ of cash compensation, or 132.3 percent of cash compensation.

related to the RMA samples for 1995 and 1996.  Petitioner's brief makes assumptions that are not stated in the brief and that appear to be neither supported by nor contradicted by the record. Respondent's brief on this issue seems to be totally irrelevant to a reasonable compensation analysis, even though it may be significant to an analysis of petitioner's intent.

We are left with Hakala's observation that some adjustment for nonsalary benefits "might be considered appropriate in a market compensation analysis".  Because of Hakala's observation, and in light of the lack of foundation for the use of 24.4 percent for mobile home retailers of petitioner's size, we conclude that we should adjust upward by some amount the estimates derived from the RMA ratios.  See Kennedy v. Commissioner, 671 F.2d 167, 175 (6th Cir. 1982), revg. 72 T.C. 793 (1979).  Doing the best we can with the record in the instant case, we increase our 1995 reasonable compensation determination to $550,000 and our 1996 reasonable compensation determination to $630,000.

(5)  Independent Investor Returns

In reaching his reasonable compensation figures, Hakala "relied primarily our [on ?] investor return analysis as an indication of the upper bound on executive compensation such that an arm's-length investor in the Company is able to realize a fair return on equity."

a. Fair Market Value Analysis

In the first part of his analysis, Hakala valued petitioner based on two "rules of thumb": (1) three times "owners' discretionary cash flow" and (2) five times earnings before interest (the net of interest income and interest expense) and taxes (only Federal income taxes), or EBIT. Owners' discretionary cashflow is the sum of EBIT, Jack's compensation, and Mary's compensation. Hakala states that, because only the owners' discretionary cashflow measure is calculated before deduction of officers' compensation, the difference in value between the two measures provides an implied amount of excess compensation. For 1995 and 1996, Hakala calculated implied excess compensation of $356,942 and $412,625, respectively. By subtracting the amounts of implied excess compensation from the amounts that petitioner paid to Jack, Hakala determined an implied amount of reasonable compensation of $405,244 for 1995 and $450,934 for 1996.

In his expert witness reports, Hakala included tables showing how his fair market value analysis would apply if petitioner had paid to Jack only the amounts that Hakala concluded would be reasonable compensation. In his original report, in which he concluded that maximum reasonable

compensation to Jack would be $544,419 for 1995[15] and $448,620 for 1996, Hakala's fair market value analysis shows that, what Hakala referred to as the implied amount of reasonable compensation would be only $418,290 for 1995, but would be $461,734 for 1996.  In his rebuttal report, in which he concluded that maximum reasonable compensation to Jack would be $599,117 for 1995 (see supra note 15) and $485,966 for 1996, Hakala's fair market analysis shows that, what Hakala refers to as the implied amount of reasonable compensation still would be only $418,290 for 1995, and $461,734 for 1996.

Hakala's analysis seems to not make any further use of the implied amounts of reasonable compensation that he thus calculated.

As far as we can tell, Hakala uses the three times owners' discretionary cashflow only in calculating "Operating return [operating income] on FMV operating assets [which Hakala apparently equates to three times owners' discretionary cashflow]" both in terms of what the ratios actually were and what the ratios would have been under the method described infra b.  Estimate of Petitioner's Discount Rate.

As far as we can tell, Hakala uses the five times EBIT only in one table, which appears twice in Hakala's original report.

---

[15]  For these calculations, Hakala ignored, without explanation, the additional $5,000 discussed supra (2) Loan Guaranty.

In that table, Hakala uses interchangeably "5 times EBIT" and
"FMV of BQH [petitioner]".  Hakala does not appear to use the
five times EBIT amount to derive anything.

Hakala has not explained, and we have not been able to
discern, any role that Hakala's fair market value analysis played
in producing Hakala's bottom-line reasonable compensation
conclusions.  Under these circumstances, we do not pause to
consider the appropriateness of Hakala's choices of the three and
five multipliers (why not 2½ and 5½, or some other sets of
numbers), of Hakala's choices of things to multiply (owners'
discretionary cashflow and EBIT), of Hakala's choices of
equivalents (three times owners' discretionary cashflow is
equivalent to the fair market value of petitioner's operating
assets; five times EBIT is equivalent to the fair market value of
petitioner), and of Hakala's method of deriving implied
reasonable compensation from these multiplier rules of thumb.

We have thought it appropriate to consider Hakala's fair
market value analysis only because (1) Hakala presented it at the
head of his independent investor returns analysis, and (2) it
helps us in evaluating the complexities of the remaining portions
of Hakala's independent investor returns analysis.[16]  However, we

[16]  In Gilbert and Sullivan's "Patience", the character
Bunthorne extols obscurity and complexity as the route to
creation of an impressive persona, as follows:

(continued...)

conclude that this fair market value analysis in Hakala's expert witness report does not lead us to any answer in our quest for the maximum amount of reasonable compensation from petitioner to Jack.

b. <u>Estimate of Petitioner's Discount Rate</u>

Hakala's next step in his investor returns analysis was to estimate the discount rate, or "cost of capital".  As Hakala uses the term, petitioner's cost of capital is the rate of return that an investor would expect to realize from an investment in a

---

[16](...continued)
If you're anxious for to shine in the high aesthetic line as
     a man of culture rare,
You must get up all the germs of the transcendental terms,
     and plant them everywhere.
You must lie upon the daisies and discourse in novel
     phrases of your complicated state of mind,
The meaning doesn't matter if it's only idle chatter of a
     transcendental kind.
               And every one will say,
               As you walk your mystic way,
"If this young man expresses himself in terms too deep
     for <u>me</u>,
Why, what a very singularly deep young man this deep
     young man must be!"

"Patience",  The Complete Plays of Gilbert and Sullivan, pp. 199-200 (New York: Modern Library).

Under Fed. R. Evid. 702, the justification for the expert witness is that the expert witness "will assist the trier of fact to understand the evidence or to determine a fact in issue".  It is not enough that the expert can communicate with other experts. The expert should be enough of a teacher or explainer so that the nonexpert trier of fact can understand the steps in the expert's analysis.  The nonexpert trier of fact should not have to be a detective, discovering clues in odd places in the expert's report, in order to understand how the expert proceeded from one step to the next.

company such as petitioner, taking into account the appropriate risk and performance characteristics of petitioner.

From his pretax operating return on net operating assets percentages, Hakala determined an adjusted average required rate of return of 16.77 percent. In so doing, he assumed "inflation plus real growth will average approximately 4.0% per annum" and grossed up for taxes. Hakala then calculated reasonable compensation numbers for Jack such that the average required rate of return was 16.77 percent. The values of the variables (operating profit and three times owners' discretionary cashflow) that Hakala used to conclude that the average required rate of return equaled 16.77 percent are pretax values. The 16.77 percent, however, contemplates that the values will be after-tax values.

Hakala chose to use the Capital Asset Pricing Model (hereinafter sometimes referred to as CAPM) to estimate petitioner's cost of capital. He states that CAPM is "A standard method of estimating the cost of capital".

Petitioner contends that CAPM "has no application to closely held companies", citing Furman v. Commissioner, T.C. Memo. 1998-157. Neither Hakala nor respondent seeks to rebut petitioner's Furman contention. Hakala did not tell us (1) whether there are other standard methods, (2) whether CAPM has advantages over

other standard methods, nor (3) why Hakala chose to use CAPM in this instance.

In Estate of Heck v. Commissioner, T.C. Memo. 2002-34, we commented as follows:

> [11] In recent cases, we have criticized the use of both the capital asset pricing model (CAPM) and WACC as analytical tools in valuing the stock of closely held corporations. See Furman v. Commissioner, T.C. Memo. 1998-157. See also Estate of Maggos v. Commissioner, T.C. Memo. 2000-129, and Estate of Hendrickson v. Commissioner, T.C. Memo. 1999-278, which reaffirm that view, citing Furman, and Estate of Klauss v. Commissioner, T.C. Memo. 2000-191, where we rejected an expert valuation utilizing CAPM in favor of one utilizing the buildup method. In other recent cases, however, we have adopted expert reports which valued closely held corporations utilizing CAPM to derive an appropriate cost of equity capital. See BTR Dunlop Holdings, Inc. v. Commissioner, T.C. Memo. 1999-377; Gross v. Commissioner, T.C. Memo. 1999-254, affd. 272 F.3d 333 (6th Cir. 2001).

Because the parties have not developed this dispute and we conclude infra that Hakala's application of CAPM to petitioner in the instant case has significant flaws, we do not determine in the instant case the conceptual suitability of applying CAPM to the valuation of closely held companies such as petitioner.

The first step in CAPM involves calculating the cost of equity capital, which Hakala defined as "the expected (or required) rate of return on the firm's common stock" that an investor would "expect to realize from an investment in a company with the risk and performance characteristics" of petitioner. Hakala estimated the cost of equity capital to be 15.06 percent

in 1995 and 15.75 percent in 1996.[17]  Hakala then estimated the cost of debt, which he based on "the prevailing prime lending rate plus 1.0%."  For 1995 and 1996, the costs of debt were 9.50 percent and 9.25 percent, respectively.

Next, Hakala applied the values determined in the preceding two steps to calculating the weighted average cost of capital, sometimes hereinafter referred to as WACC.  Hakala determined that the WACC was 14.16 percent for 1995 and 14.76 percent for 1996.

In his expert witness report, Hakala described this process as "using weights reflecting the relative importance of debt and equity in the typical firm's capital structure."  He multiplied the cost of equity capital by a fraction derived from the relative portion of total capital that consisted of equity; he

---

[17]  Hakala's report shows the arithmetic as follows:

1995: "15.06% = 5.96% plus (7.40% times 1.09) plus 1.00%"
1996: "15.75% = 6.65% plus (7.40% times 1.09) plus 1.00%"

Sledge's supplemental report adds the same components for 1995 as follows:

| | |
|---|---|
| Long-Term Risk Less [sic] Rate | 5.96 |
| + Market Risk x Beta 7.4 x 1.09 = | 8.07 |
| + Non-systematic risk | 1.00 |
| = Required return on equity | 15.06 rounded |

Sledge then uses the 15.06 percent in his calculations.

When we perform the indicated arithmetic, we get 15.026, rounded to 15.03 percent for 1995, and 15.716, rounded to 15.72 percent for 1996.

multiplied the cost of debt capital by a fraction derived from the ratio of debt to equity (instead of the ratio of debt to total capital); and he added the two products together to produce his WACC amounts.

Sledge, in his rebuttal report, points out (correctly) that Hakala's debt multiplier should have been the ratio of debt to total capital; that the sum of the debt multiplier and the equity multiplier should be 1.000, while Hakala's sum was 1.0123; and that this error by Hakala resulted in Hakala's overstating the WACC and thereby understating the amount of reasonable compensation. (Sledge also has errors, discussed infra.)

Hakala has chosen to use 11.70 percent as the basic debt-equity ratio. From this, he derives the equity multiplier of 0.8953 (this is one, divided by 1.117). It follows that the debt multiplier should be 1.0 minus 0.8953, or 0.1047, and not the 0.117 that Hakala used. If we correct this error and the above-noted error of 15.06 percent rather than 15.03 percent for the cost of equity capital, then Hakala's CAPM approach should yield a 1995 WACC of 14.08, instead of Hakala's 14.16. Similar corrections would apply to the 1996 WACC. Because a lower WACC leads to higher reasonable compensation under Hakala's approach, these corrections in Hakala's numbers would result in an increase in the reasonable compensation numbers that Hakala recommends.

Hakala testified that correcting the WACC "caused the numbers in both years to go up" and stated in his rebuttal report that "The calculation of the weights for debt and equity in the BVS report [Hakala's expert witness report] was inconsistent with the assumed weights in the original Exhibit IV-2."

However, we are unable to determine exactly what corrections Hakala made in his WACC calculations that led to the substantial increases in his recommendations as to reasonable compensation. As a result, we do not know whether Hakala has already corrected for the above-noted errors.

In Sledge's rebuttal report, he pointed out that the combined debt and equity multipliers that Hakala used to determine the cost of debt and the cost of equity exceeded 1.0. He then proposed debt and equity multipliers that total 1.0, and he demonstrated the effect of the change by calculating the WACC for 1995, which he determined was 13.66 percent. Sledge presented this as follows:

3. This is the weighed [sic] average cost of capital, WACC, and is calculated as shown below.

| | | |
|---|---|---|
| Cost of debt | 9.50 x (1 -.38) | = 5.89 |
| This is the cost of debt after taxes | | |
| Weighed [sic] cost of debt | 5.89 x .1170 | = 0.69 |
| + Weighed [sic] cost of equity | 15.06 x (1/1 +.1170) = | |
| or, | 15.06 x .8953 | = 13.48 |
| = WACC | | 14.16 rounded |

DR. HAKALA HAS MADE AN ERROR IN THE CALCULATIONS OF WACC

Refer to Exhibit Rebut-19.1 [an attachment in Sledge's rebuttal report] and you will see the correct formula for WACC.  While Dr. Hakala has correctly written the formula on his p. 20, he does not compute it correctly.

CORRECT CALCULATIONS FOR WACC.

```
        Cost of debt               9.50 x (1 - .38)  = 5.89
        This is the cost of
          debt after taxes
        Weighed [sic] cost of debt      5.89 x .0928  =   0.55

  +  Weighed [sic] cost of equity  15.06 x .9072  =  13.66

  = WACC                                               13.66
```

As this excerpt shows, Sledge failed to add together the weighted cost of debt and the weighted cost of equity in his calculation.  The corrected WACC, according to the values Sledge proposed, is 14.21 percent for 1995 and 14.82 percent for 1996, amounts greater than what Hakala had determined.  Thus, while Sledge correctly noted one of Hakala's mathematical errors, Sledge's proposed solution leads to (or would have led to, if Sledge had carried the analysis out) reasonable compensation conclusions that are less than Hakala's conclusions.

As we noted supra, Hakala used 11.70 percent as the debt-equity ratio in calculating the relative weights to be given to debt capital and equity capital.  He did not give us any source for his statement that this is "the relative importance of debt and equity in the typical firm's capital structure."  (Emphasis

added.)  However, elsewhere in his report he indicated that 11.70 percent is the <u>average</u> debt-equity ratio of four named firms.

These four firms had debt-equity ratios ranging from 0.8 percent to 33.6 as of June 30, 1996.  We are not given any information that would lead us to conclude that the average of four firms' widely disparate capital structures happens to be precisely equal to "the typical firm's" capital structure.

All four firms are publicly traded, while petitioner is not. We do not find any information suggesting that this makes a difference or does not make a difference in what a reasonable independent investor would do with a firm like petitioner.

Hakala told us that "each of the four firms is a large manufacturer of * * * [mobile] homes with a large retail organization."  Petitioner is entirely a retailer.

Hakala told us that the four firms had sales of $208 million to $862 million a year for 1995 and 1996, while petitioner's sales were only $9-10 million.

Hakala described the four firms as "billion dollar companies", while he regarded petitioner as worth only a few million dollars.

Hakala did not present to us any explanation (much less evidence supporting any explanation) as to whether or not adjustments should be made to this particular four-firm average debt-equity ratio to arrive at a typical debt-equity ratio that

would be meaningful with regard to firms that are similar to petitioner. Because (1) Hakala's CAPM analysis makes reasonable compensation vary directly with the debt-equity ratio,[18] and (2) Hakala contends that his CAPM analysis enables him to determine Jack's maximum reasonable compensation to the dollar, it becomes important for us to have confidence in the correctness of Hakala's determination of 11.70 percent as the debt-equity ratio to use.

Because of the above-noted omissions, we have no idea what debt-equity ratio is appropriate to use in a CAPM analysis. This makes us reluctant to rely on a CAPM analysis based on the record in the instant case, whether or not CAPM analyses are viewed as conceptually appropriate for firms such as petitioner.

Finally, we note that, in his expert witness report, Hakala's arithmetic was inconsistent with his narrative description of the process of moving from WACC to pretax operating return on net operating assets. The arithmetic was consistent with an assumed combined State and Federal tax rate of about 41 percent, while the narrative states that Hakala used 38 percent. In his rebuttal report, Sledge pointed out the error

---

[18] Under Hakala's approach, the cost of debt capital is substantially less than the cost of equity capital. Thus, a greater debt-equity ratio leads to a lesser weighted average cost of capital (WACC). This means that under the CAPM, the greater the debt-equity ratio, the less the net profit that an independent investor would require, and so the independent investor could afford to pay more compensation.

and stated that "Correction of this error in math will raise the allowable compensation to Jack Brewer by about $94,000." In his rebuttal report, Hakala appears to have corrected this error[19] and has increased his recommended reasonable compensation amounts by a total of $92,044 for 1995 and 1996.

We note that Hakala did not make any change to his original WACC amounts, in correcting his expert witness report, and that his "bottom-line" determinations changed by almost the same amount that Sledge stated would be the case if Hakala were to make the corrections. Yet, when asked about this matter at trial, Hakala testified that his error was in the weighting of the two components of WACC, and not in the assumed tax rate.

We have described supra some mathematical errors that Hakala made in his WACC calculations. Hakala did not correct these errors. It appears that if these were corrected, then Hakala's "bottom-line" numbers would be greater, but we cannot tell by what amounts.

c. Determination of Compensation Formula

After Hakala determined a net required rate of return of 16.77 percent, he "conducted an analysis to determine a compensation formula to arrive at a reasonable range for

---

[19] We say "appears to", because Hakala's final numbers are not precisely the same as Sledge's numbers. We suspect that the differences are due to rounding at earlier stages of the computation, but we cannot be sure, because Hakala does not present a clear explanation of what he did.

officer's compensation such that an arm's-length investor could realize market rates of return on invested capital in * * * [petitioner]".[20]

Hakala calculated the "theoretically appropriate officers' compensation" by starting with a base salary of $207,000. He determined this amount by multiplying by 1.5 the median base salary shown in a survey for 1994 by Panel Publications of Aspen Publishing, hereinafter sometimes referred to as Panel/Aspen. Hakala did not explain why he multiplied the 1994 median base salary by 1.5, or why he used 1994 as a base year when he provided the data for 1995 and 1996--but not for 1994--in his report. Also, the data Hakala used was from both (1) the fabricated metal and wood products industry group and (2) the business services industry group. We are unclear as to how these industry groups are similar to petitioner. Hakala admitted that the comparability is somewhat limited and "not a very good fit". Nevertheless, he claimed that the data "provided information".[21]

---

[20] This 16.77 percent (18.18 percent in Hakala's first expert witness report) is determined as an average of the information for 1995 and for 1996. Hakala has not explained how there could be a plausible scenario in which an "arm's-length investor" would take into account 1996 information, including 1996 interest rates, in agreeing to compensation payments in 1995.

[21] Hakala's justification at trial for use of the Panel/Aspen data from the "Fabricated Metal and Wood Products Industry Group" and the "Business Services Industry Group" to determine a base salary for Jack was as follows:

(continued...)

21(...continued)

[Q. by Calkins, on direct]  Now, Dr. Hakala, we're going to Exhibit 57-P, which is Ms. Ding's rebuttal to your report.

A  Okay

Q  Ms. Ding assigns a number of errors in her report, and we'll briefly go through each of these errors.

At page 2, error number one, she addresses the use of the Penell [Panel/Aspen] Publishing Survey, criticizing the data and the size of the company.

Could you comment on that?

A  There's some validity to the limitations on the use of the Penell, since I used fabricated metal wood products and business services.

I did pick the right types of industries, but the survey is too broad to probably be as applicable as I would like.
It's informative, but it's certainly not determinative of my ultimate opinion in the case.

Q  So, when she says this data is not valid--

A  It's valid.  It's used all the time in the real world to sort of condition what you'd make in a small, closely-held company, but the issue is that you have to sort of condition the data for what industry and sector you're in, and that element of her criticism I think has some validity, a lot of validity.

*     *     *     *     *     *     *

Q [By Mayo, on cross]  Okay.  The first thing you did was you went to a survey called Pennell [Panel] Aspen Publishing Survey.

A  Yes.

Q  And that was a survey of compensation of CEO's.

(continued...)

- 63 -

     A  Yes.

     Q  And the first industry you looked at was wood products manufacturing?

     A  Fabricated metal and wood products.

     Q  Yeah, fabricated metal, that's not really very closely related to Mr. Brewer's business, though, is it?

     A  It's not a very good fit.  It -- he's selling products that might --

     Q  Small, low tech components, you know, pegs and brackets and that kind of stuff.

     A  Not always.  Exacto Spring fell in there, but anyway.

     Q  How about Business Services?  What was Business Services?

     A  It's so broad.  It's also not a very good fit.  I think some are -- yeah, on page 13, I say thus, the comparability is somewhat limited.

     Q  Yeah, but that was what you used.

     A  It provided information.

     Q  I want to point out to the Court that there are some weaknesses in this analysis.

     A  I agree.

     Q  You agree that there are some weaknesses?

     A  Agree, and it provides some information, but the analysis is limited.

     Q  Right, and there are some weak -- because it's wood products and business services, neither one are kind of directly related to Mr. Brewer?

(continued...)

To determine the base salary for 1995 and 1996, Hakala increased the 1994 theoretical base salary of $207,000 by 4 percent per year. Thus, the base salary for 1995 and 1996 would have been $215,280 (207,000 x 1.04) and $223,891 (215,280 x 1.04), respectively. Hakala then determined the bonus amounts based on a percentage of the operating income before officers' compensation. In his expert witness report, Hakala explains as follows:

> The bonus percentage is solved based on the projected 4% per annum rate of growth, the expected operating expenses before officers' compensation in each future year and a required average net operating return on operating assets of 18.18%.

> Based on our analysis we calculate that the reasonable compensation for Mr. Brewer to achieve a 18.18% investor return is $544,419 in 1995 and $448,620 in 1996. This corresponds to a bonus of $329,568 in 1995, which would be 65.8% of theoretical operating income, and a bonus of $225,022 in 1996, which would be 31.9% of theoretical operating income.

In his rebuttal report, Hakala noted that his revised adjusted average required operating return on net operating assets (16.77 percent, rather than 18.18 percent) resulted in his increasing the recommended compensation level for each year, as described _supra_. However, he attributed this change entirely to recalculation of the weights for debt and equity.

Hakala's discussion of the Panel/Aspen data described _supra_ does not seem to affect his conclusions at all, except as to how

---

[21](...continued)
    A. Correct.

much of Jack's maximum reasonable compensation should be labeled base pay and how much should be labeled bonus. He apparently regarded this as so inconsequential that, in his rebuttal report, he did not bother to correct the bonus components when he revised the total compensation amounts. We cannot tell what function Hakala's discussion of base pay serves in Hakala's reaching, or explaining, his bottom-line conclusions.

Hakala's discussions of other comparisons, although eventually discarded, serve the appropriate function of demonstrating that those comparisons would have resulted in lower permissible amounts of reasonable compensation; they thereby make the CAPM approach appear to be more generous to petitioner than would be the case if the other methods had not been presented.

When "push came to shove", Hakala's conclusions rested entirely on CAPM, and respondent followed Hakala's conclusions to the dollar.

### (6) Conclusion

Hakala has not presented us with a description of how his various analyses fit together to lead to the final numbers he reaches. He has not specified what points in his analyses are being corrected and how these corrections result in the changed numbers between his original expert witness report and his rebuttal report. As to the many different variables in CAPM,

Hakala has not indicated why we should accept his choices in values rather than other choices, such as Sledge's.

Sledge, however, has not shown us how the changes in values result in his conclusions. Rather, he simply concludes that changing one of the variables to a value that is more favorable to petitioner results in a specified amount of greater maximum compensation. Without a thorough explanation or demonstration of why his changes result in the numbers that he reaches, we do not accept Sledge's conclusions. Further, we cannot tell from the information included in the expert reports whether a variation in any particular value is likely to cause a great or only slight change in the bottom line, and often it is not apparent whether a change is likely to increase the maximum amount of reasonable compensation or decrease the maximum amount of reasonable compensation.

In fact, Sledge conceded that it would be highly improbable for all of his suggested revisions to Hakala's CAPM numbers to be operable together. Adoption of some of his suggested revisions very likely would require that some other suggested revisions would have to be rejected, or might have to be revised in such a way as to result in the latter revisions undoing the effect of the former revisions.

We also note the paradox in Hakala's approach that the more successful Jack was in building up petitioner, the less the

amount Hakala would say would be reasonable compensation. We find it difficult to justify an analysis that leads to such a counterintuitive result.

Under these circumstances, we conclude that (1) Hakala's application of CAPM on the record herein presents too many difficulties to justify using CAPM in the calculation of reasonable compensation for Jack, and (2) neither Hakala nor Sledge has explained CAPM sufficiently for us to be able to determine what would be the bottom-line effect of even correcting the arithmetic errors we have described, except that we perceive it is more likely than not that those corrections would produce reasonable compensation numbers somewhat greater than those that Hakala recommended.

However, it appears from respondent's reactions on brief that respondent is willing to accept Hakala's recommendations even when the amounts exceed what had been determined in the notice of deficiency. Accordingly, we conclude: (1) Based on the foregoing analysis of Hakala's independent investor approach and the correction of Hakala's arithmetic errors (plus the allowance for Jack's loan guaranty), 1995 reasonable compensation for Jack's services is $610,000; and (2) based on the foregoing analysis of the RMA data (plus an amount for nonsalary benefits), 1996 reasonable compensation for Jack's services is $630,000.

2. <u>Intent</u>

Because of the comparatively subjective nature of the determination of a taxpayer's intent in making a payment to a shareholder-employee, courts have generally concentrated on the reasonableness prong rather than the intent prong in section 162(a)(2) cases.  See, e.g., <u>Elliotts Inc. v. Commissioner</u>, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. T.C. Memo. 1980-282.  However, it is clear that if a payment was not intended to be compensation for personal services, then it will not be deductible under section 162(a)(2) even if the payment did not exceed reasonable compensation.  See <u>King's Court Mobile Home Park v. Commissioner</u>, 98 T.C. at 514-515; <u>Paula Construction Co. v. Commissioner</u>, 58 T.C. at 1057, 1059-1060.

Having made determinations as to the maximum amounts of petitioner's payments to Jack that would be reasonable compensation for Jack's services, we now proceed to the second prong--whether any portions of those reasonable amounts are nevertheless not deductible by petitioner because they were not intended as compensation.

Respondent contends "that part of the payments [to Jack] deducted by petitioner are disguised dividends."  In support of this contention, respondent directs our attention to the following:  (1) Jack's testimony that if petitioner had a good year, then Jack had a good year, (2) the yearend ad hoc

determination of Jack's bonuses and absence of any compensation plan for Jack are indicia of an intent to distribute earnings rather than pay compensation for services, and (3) the incentive to avoid one of the two layers of income taxation of dividends.

Petitioner contends that the issue is not properly before the Court in the instant case (see supra note 4), and devotes its efforts to the reasonable compensation prong.

We agree with respondent that (1) the issue is properly before us and (2) the evidence to which respondent draws our attention points toward an intent to distribute earnings.

However, in the instant case this agreement with respondent's position does not result in any disallowance of otherwise reasonable compensation.

In each year before us, substantially all of petitioner's payments to Jack were made by way of a bonus at the end of the year.  There is no testimony or other evidence that indicates that the participants in the discussions--Jack and Sledge--had one intention with regard to a portion of each bonus and a different intention with regard to the remaining portion of each bonus.  Thus, one might contend that a contaminating intention should result in disallowance of deductions for the entirety of each bonus, or alternatively that the contamination was not great enough to require disallowance of deductions for any part of each bonus.

Yet, from the notice of deficiency onward respondent clearly has not taken the all-or-nothing approach. Rather, even though respondent seems to regard the intent prong as more important than the reasonable amount prong, at each stage respondent has applied the intent argument only to so much of petitioner's payments to Jack as exceeds reasonable compensation.[22]

On the basis of the record in the instant case, consistent with the foregoing, we conclude that part of the amounts petitioner paid to Jack in each of the years in issue was not intended as compensation. The part that was not intended as compensation in each year is the amount by which the payments exceeded the amounts that we have held to be reasonable compensation. See supra table 4.

---

[22] For example, in the opening statement at trial, respondent's counsel described respondent's position as follows:

It is Respondent's position that in spite of Mr. Brewer's contributions to Petitioner during the years at issue, the payments to him over and above what Respondent has allowed in the trial memorandum should be disallowed as disguised dividends.

The trial memorandum reference is as follows:

Respondent's expert witness opinion (as modified by revised Exhibit IV-3 in the rebuttal report) provides for reasonable compensation for services rendered to petitioner by Mr. Brewer of $599,117.00 for 1995 and $485,966 for 1996. Further, the report allows additional compensation of $5,000.00 to Mr. Brewer for providing his personal guarantee to secure a short-term working capital line of credit in 1995. It is respondent's position that the stated amounts represent the reasonable compensation to Mr. Brewer and will be sustained by the Court as such.

Thus, we hold, for petitioner, that all of the amounts petitioner paid to Jack that would not exceed reasonable compensation for Jack's services were in fact paid as compensation for Jack's services.

To take account of the foregoing,

<u>Decision will be entered under Rule 155</u>.